RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0070p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GLENN KAMPER (12-5167) and JOE HEAD (12-5800),

*Defendants-Appellants.*

Nos. 12-5167/5800

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga
No. 1:11-cr-3—Curtis L. Collier, District Judge.

Argued: November 21, 2013

Decided and Filed: April 9, 2014

Before MOORE and GRIFFIN, Circuit Judges; KORMAN, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Amy Baron-Evans, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Boston, Massachusetts, for Appellant in 12-5167. Allison L. Ehlert, EHLERT APPEALS, El Cerrito, California, for Appellant in 12-5800. Luke A. McLaurin, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Amy Baron-Evans, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Boston, Massachusetts, Nikki C. Pierce, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Greeneville, Tennessee, for Appellant in 12-5167. Allison L. Ehlert, EHLERT APPEALS, El Cerrito, California, for Appellant in 12-5800. Luke A. McLaurin, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, Jay Woods, UNITED STATES ATTORNEY'S OFFICE, Chattanooga, Tennessee, for Appellee.

_____

[*]The Honorable Edward Korman, United States District Judge for the Eastern District of New York, sitting by designation.

———————————————

**OPINION**

———————————————

KAREN NELSON MOORE, Circuit Judge.   Defendants-appellants Glenn Kamper and Joe Head appeal their respective 144-month sentences imposed for their roles in a conspiracy to manufacture and distribute MDMA (also known as 3,4-methylenedioxymethamphetamine or "ecstasy") in Chattanooga, Tennessee.   Head and Kamper both appeal their sentences as procedurally and substantively unreasonable.   Kamper argues that the MDMA-to-marijuana equivalency ratio underlying his Guidelines sentencing range is based on faulty science, and that the district court erred when it justified its refusal to reject the Guidelines ratio with institutional concerns.   We conclude that the district court misunderstood its authority to reject and replace a Guidelines equivalency ratio based on policy disagreements, but conclude that the district court's error was harmless.   We reject Kamper's other arguments regarding the reasonableness of his sentence as without merit.   Head argues that the district court erred in applying sentencing enhancements for his aggravating role in the criminal conspiracy and for obstruction of justice. We conclude that Head's sentence must be vacated because the district court erred in applying a sentencing enhancement for obstruction of justice.   Accordingly, we AFFIRM the judgment of the district court with respect to Kamper, but REVERSE the judgment of the district court with respect to Head and REMAND for resentencing.

**I.  BACKGROUND**

**A.  The Conspiracy**

In early 2009, Glenn Kamper, Joe Head, and Jonathan St. Onge devised a plan to manufacture and distribute MDMA in Chattanooga, Tennessee.   K.R. 243 (Trial Tr. at 116) (Page ID #1201).[1]   Each of the men filled a different role in the conspiracy:  Kamper was the administrator, Head was in charge of manufacturing, and St. Onge organized the distribution. Kamper first proposed the idea of dealing drugs, he supplied the initial start-up funds and

---

[1]The designation "K.R." refers to record documents in Kamper's case, No. 12-5167.  The designation "H.R." refers to record documents in Head's case, No. 12-5800.

"provided cash flow," and he ensured that the process stayed "on an even keel." *Id.* at 116 (Page ID #1201). Head had access to chemical supplies through his laboratory job at a water treatment facility, and he used his education and training in chemistry to devise a method of producing MDMA from the sassafras plant. *Id.* at 117 (Page ID #1202). St. Onge drew on his experience dealing other drugs to organize a distribution network among deejays and others involved in the "rave scene." *Id.* at 118–19, 139 (Page ID #1203–04, 1224).

The three men initially manufactured MDMA at Kamper's home, but they later relocated to a house in Georgia. *Id.* at 124–25 (Page ID #1209–10). During the manufacturing process, Head extracted a compound naturally produced in the sassafras plant and used several toxic chemicals to transform the natural compound into a synthetic compound. None of the other conspirators had the education or training necessary to understand or execute the manufacturing process: "[Head] was the brains behind everything, all the chemical work." *Id.* at 133 (Page ID #1218). At times, other co-conspirators, including St. Onge, Kamper's boyfriend Jared Pietzsch, and Head's roommate Jeremy Harvey, assisted Head with "menial tasks" related to the production process, such as "cutting up little squares of aluminum foil [and] holding things that were heavy." *Id.* at 121–22 (Page ID #1206–07). However, they would generally "stay away from the [manufacturing] process" even when they were in the house at the same time. *Id.* at 151 (Page ID #1236).

The conspirators sold approximately two to three ounces of MDMA per month beginning in late 2009. *Id.* at 127 (Page ID #1212). In November 2010, a confidential informant ("CI") purchased MDMA from Christopher Hutchinson, a co-conspirator involved in the distribution arm of the enterprise. Several months later, the CI arranged to purchase an additional pound (453.6 grams) of marijuana from Benjamin Park, who shared a residence with Hutchinson. Kamper Presentence Report ("PSR") ¶ 15; Head PSR ¶ 15. While observing the residence on January 19, 2011, law-enforcement officers saw St. Onge arrive with a large package, which they found to contain 447.5 grams of MDMA. Kamper PSR ¶ 16; Head PSR ¶ 16. They arrested St. Onge and used his phone to contact Kamper with an order for an additional ounce (28.35 grams) of MDMA. Pietzsch soon arrived at St. Onge's residence with the requested MDMA, and he was also arrested. Upon searching Pietzsch, law enforcement officers found a record of a FedEx

package shipped to Carlos Zamora-Chang earlier in the day.  When they intercepted the package, they found that it contained an ounce of MDMA.  Kamper PSR ¶ 17; Head PSR ¶ 17.  On January 25, 2011, Kamper, Head, and several other co-conspirators were indicted for conspiring to distribute MDMA and possessing MDMA with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846.  K.R. 12 (Indictment) (Page ID #21–23).

**B.  Kamper's Guilty Plea and Sentencing**

After an indictment was filed against him, Kamper pleaded guilty.  He was incarcerated pending sentencing, and by some mistake he was housed in the same jail pod as St. Onge, who was cooperating with law enforcement.  On August 24, 2011, Kamper wrote the following letter to Head:

> You gotta love this though . . . they moved me about a week and a half ago, into another pod here and they totally fucked up and put me into the same pod as that rat asshole Jonathan [St. Onge]!!!  So now I have to look at his pathetic face every day, but at least he stays far away from me and walks the other way whenever he sees me when we are out in the big common room when we are not in our cells. I've also made sure that everyone else in this pod, about 35 guys, knows that he is a rat and a snitch and now hardly anyone talks to him any more since no one likes a rat in jail. . . .

K.R. 172 (Kamper Ltr. at 3) (Page ID #445).  St. Onge testified that, although he had initially been comfortable in the jail pod, he found that after Kamper spread word that he was a snitch the other inmates had become "rile[d] up" and he began to fear that they would "tak[e] a physical action" against him or make him an outcast.  K.R. 224 (Sentencing Hr'g Tr. at 93–94) (Page ID #1003–04).  St. Onge requested that he be transferred to a different pod.  *Id.* at 93 (Page ID #1003).

In his presentence report ("PSR"), Kamper was held responsible for a total of 1,218.75 grams of MDMA, which was the equivalent of 609.375 kilograms of marijuana.  *See* U.S.S.G. § 2D1.1, cmt. 8(D).  To Kamper's base offense level of 28, the probation officer recommended applying a two-level enhancement for obstruction of justice pursuant to § 2D1.1(b)(14)(D) and a four-level enhancement for his role as a leader or organizer of the conspiracy pursuant to § 3B1.1(a).  The probation officer recommended denying an adjustment for acceptance of responsibility because Kamper's behavior toward St. Onge was inconsistent with such a

reduction.    Kamper's advisory sentencing range was calculated as 151 to 188 months of imprisonment.

Kamper filed several objections to the conclusions contained in his PSR.  He argued that he should not have received either the obstruction of justice or leadership role enhancement and that he should have received a downward adjustment for accepting responsibility by pleading guilty.   He also objected to the MDMA-to-marijuana equivalency ratio contained in the Sentencing Guidelines, asserting that the ratio was based on discredited science.  In connection with this objection, Kamper filed a motion (the "Ratio Motion") requesting that the district court select a new MDMA-to-marijuana equivalency ratio to compute a more appropriate sentence, or at least vary from the Guidelines range calculated using the flawed ratio.  K.R. 162 (Ratio Motion) (Page ID #378–402).  In the Ratio Motion, Kamper argued that the MDMA Guidelines were passed in response to congressional policy directives rather than statistical or scientific evidence, and that the ratio selected was based on disproven and discredited science.  The Ratio Motion relied heavily on *United States v. McCarthy*, No. 09 Cr. 1136, 2011 WL 1991146 (S.D.N.Y. May 19, 2011), a case in which a district court had rejected the Guidelines MDMA-to-marijuana ratio and instead sentenced the defendant under the same ratio as that used for cocaine offenses.  Kamper argued that the district court in the instant case should likewise reject the Guidelines ratio and substitute a lower ratio.

At sentencing, the district court discussed Kamper's objection to the MDMA-to-marijuana equivalency ratio at length.  The sentencing judge heard argument from both parties regarding the science and policy considerations underlying the ratio, and the implications for future sentencing of adopting a new ratio in Kamper's case.  K.R. 224 (Sentencing Hr'g Tr. at 7–58) (Page ID #917–68).  The district judge also expressed concern that there were not statistics available showing how many judges across the nation were sentencing outside of the Guidelines range in MDMA cases.  *Id.* at 33 (Page ID #943).

Ultimately, the district court declined to reject the ratio embraced by the Guidelines and denied Kamper's Ratio Motion.  The court compared the vast resources and institutional role of the Sentencing Commission to its own, more circumscribed abilities.  *Id.* at 59–60 (Page ID #969–70).  The sentencing judge then described the framework he had used in past cases, *id.* at

60–62 (Page ID #970–72) (citing *United States v. Phelps*, 366 F. Supp. 2d 580 (E.D. Tenn. 2005), and *United States v. McElheney*, 630 F. Supp. 2d 886 (E.D. Tenn. 2009)), and concluded:

> The Court thinks instead of each individual district judge across the United States arriving at his own guideline system, the better approach would be the approach that is suggested in *McElheney*, and that would be to determine whether the guideline is correct. After the Court determines the correct guideline, the Court then would see if a departure upward or downward is proper. After that, the Court would then look at the [18 U.S.C. §] 3553(a) factors and determine whether that guideline sentence is no greater than necessary to achieve the purposes of 3553. If such a sentence is greater than necessary, then the Court should impose a lower sentence, which is what the Court did in *McElheney*.
> So in this case, in light of this motion, the Court will deny the motion. The Court concludes that the Sentencing Commission is in a better position than this Court to take into account all of the various value judgments involved in adopting a particular guideline. But at the end of the day the Court will determine whether under 3553(a) the guideline provides the Court with a sentence that is greater or less than necessary to accomplish the purposes of sentencing as stated in Section 3553(a).

*Id.* at 62 (Page ID #972).

After considering other objections, the district court returned to the equivalency ratio issue before sentencing each defendant:

> The Court recognizes that it has the authority to impose a sentence outside of the guidelines. The Court also specifically recognizes that it has the authority to impose a sentence outside of the guidelines, based upon the *Kimbrough* decision, and with that decision the Court recognizes it has the authority to adopt a ratio different from the ratio that is in the guidelines.
> . . . And the Court will exercise its authority to use not a different ratio but to determine that the guidelines based upon the ratio may result in a sentence that is greater than necessary to comply with the factors set forth in Section 3553.

*Id.* at 117–18 (Page ID #1027–28). The sentencing judge concluded that the Guidelines range was inappropriate for Kamper based on the drug quantity involved, but expressed concern that his "involvement with these defendants is much, much more serious than the typical leader or organizer of a conspiracy, because of the difference in [his] leadership, [his] age, [his] experience, [and his] abilities." *Id.* at 132 (Page ID #1042).

After the sentencing hearing, the district court published a written memorandum explaining its decision in greater detail. The district court summarized its authority to depart from the guidelines ratio as follows:

> In making this request, Kamper in essence asks the Court to step into the shoes of Congress and the Commission and legislate a change to the drug equivalency table under the Guidelines. Were the Court to take this step, it would reach beyond the bounds of the Constitution's vesting of the 'judicial Power of the United States' in the federal judicial branch. U.S. Const. art III, §1. . . . Although *United States v. Booker*, [543 U.S. 220 (2005)], rendered the Guidelines advisory, neither that decision nor its progeny permits a federal court to extend the Article III judicial power to include the legislative and rulemaking powers vested in Congress, and through Congressional delegation, in the Commission. Because the Court cannot take on the powers of Congress and the Commission to establish sentencing policy, and because the Court would refrain from doing so in this case for institutional reasons even if it could assume such powers, the Court denied Kamper's motion.

*United States v. Kamper*, 860 F. Supp. 2d 596, 599–600 (E.D. Tenn. 2012). The district court again adhered to the approach it adopted in *Phelps* and *McElheney*, and declined to reject categorically the equivalency ratio embodied in the Sentencing Guidelines.

First, the district court maintained that its authority was confined to the adjudicative rather than the legislative function. *Id.* at 603–06. It reasoned that courts have no authority to "engage in the rulemaking process" because they are not popularly elected, representative bodies: "[T]his Court questions whether endowing district court judges with the general power to engage in rulemaking in the sentencing context would run afoul of the important structural principle in our Constitution that separates legislative and adjudicative functions." *Id.* at 604. To the extent that *Kimbrough* suggested otherwise, the district court limited the "broad reject-and-replace power" to solely cases involving crack cocaine. *Id.* The district court also noted that adopting the reject-and-replace approach would lead to widespread sentencing disparities as each judge adopted a different equivalency ratio to produce widely varying sentencing ranges. *Id.* at 605. The district court also reiterated its concern that no statistics were available regarding how frequently other judges deviated from the Guidelines in MDMA cases. *Id.* at 608.

Second, the district court noted that, even if it had authority to reject the drug equivalency ratio in the Guidelines, institutional considerations counseled against using such authority. *Id.* at

606–09.  It recognized that the Sentencing Commission is in a better position to gather scientific evidence and testimony and to answer the empirical questions implicated in making judgments regarding national sentencing policy.  *Id.* at 606–07.  The district court also deferred to the Commission's superior claim to making "value judgments concerning the relative harm of a controlled substance." *Id.* at 607.  Thus, the district court concluded that "even assuming it had the power to legislate a new MDMA-to-marijuana ratio, [it] must decline Kamper's invitation to do so." *Id.* at 609.

The district court's use of the Guidelines' MDMA-to-marijuana equivalency ratio was not Kamper's only objection to his sentence.  At the sentencing hearing, Kamper also objected to the enhancement related to his role as a leader or organizer of the conspiracy.  Kamper argued that he, Head, and St. Onge shared decision-making authority and that he had no greater authority than the other two conspirators.  K.R. 224 (Sentencing Hr'g Tr. at 67) (Page ID #977).  In response to Kamper's argument that the three men shared equal authority, the district court explained:  "I don't see why three people could not be organizers and leaders.  They each have different roles. . . .  [T]hey were organizing the conspiracy.  And then the conspiracy and each conspirator is responsible for the acts of others." *Id.* at 76–77 (Page ID #986–87).  The district court then concluded that Kamper's active role in planning and organizing the conspiracy merited an aggravating-role enhancement pursuant to U.S.S.G. § 3B1.1.  *Id.* at 79 (Page ID #989).

Finally, Kamper objected to the enhancement for obstruction of justice and the denial of an adjustment for acceptance of responsibility.  Kamper argued that he did not intend to threaten or intimidate St. Onge, who was a cooperating witness for the government when Kamper told other inmates that St. Onge was a rat and a snitch.  Kamper claimed that, because he had never before been to jail, he did not understand that other inmates might physically threaten St. Onge if they knew he was cooperating with the government.  *Id.* at 82–84 (Page ID #992–94).  The district court rejected Kamper's assertion that he was ignorant of jailhouse culture in this respect:

> [M]y assumption is, with his years and his education and some experience, he's probably watched some television shows, he's probably gone to some movies from time to time.  And there are a lot of television shows and movies about what happens to snitches and how snitches are not well-received in jails and in prisons.

> I think from time to time there are even newspaper stories about cooperators and snitches being killed once they get to prison. . . . Should the Court assume that Mr. Kamper has lived such a sheltered life that he's never been exposed to any of this common knowledge?

*Id.* at 84 (Page ID #994). Pursuant to U.S.S.G. § 3C1.1, the district court applied the obstruction-of-justice enhancement to Kamper's sentence, concluding that "sending a letter to people or telling people in a jail that someone else is a rat and snitch and that bad things happen to them amounts to threatening or intimidating, indirectly or directly, the person." *Id.* at 99 (Page ID #1009). Finally, the district court also concluded that such conduct indicated that Kamper had not accepted responsibility, and it refused to apply a downward adjustment pursuant to § 3E1.1. *Id.* at 99–100 (Page ID #1009–10). The district court ultimately sentenced Kamper to 144 months of imprisonment. *Id.* at 134 (Page ID #1044).

**C. Head's Trial and Sentencing**

Head protested his innocence and went to trial. St. Onge was a cooperating witness for the government: he gave detailed testimony regarding the conspiracy's goals and operations, and the roles that each conspirator played. Head also testified at his trial, maintaining that he was innocent and had "no idea" what the process of manufacturing MDMA entailed. H.R. 244 (Trial Tr. at 263) (Page ID #1348). He also flatly stated that he had never produced MDMA. *Id.* After trial, the jury convicted Head for his role in the conspiracy. H.R. 131 (Jury Verdict) (Page ID #264).

The probation office determined that Head was responsible for 1,218.75 grams of MDMA, equivalent to 609.375 kilograms of marijuana. To the resulting base offense level of 28, the probation office recommended applying a two-level obstruction-of-justice enhancement pursuant to §3C1.1, a three-level managerial-role enhancement pursuant to §3B1.1(b), and a two-level dangerous-weapons enhancement pursuant to § 2D1.1(b)(1). Head's advisory sentencing range was calculated as 168 to 210 months of imprisonment.

Head raised objections to each enhancement recommended by the probation office. The district court declined to apply the weapons-related enhancement, H.R. 245 (Sentencing Hr'g Tr. at 37) (Page ID #1620), but applied the remaining two enhancements related to managerial role

and obstruction of justice. Head argued that even though he had been in charge of manufacturing MDMA, the managerial-role enhancement did not apply because he had never managed or directed another person. The district court determined that the managerial-role enhancement applied because each of the three co-conspirators was "jointly the manager or supervisor of the entire operation." *Id.* at 40 (Page ID# 1623). It also concluded that the obstruction-of-justice enhancement applied because Head had committed perjury by denying any knowledge of or involvement in manufacturing MDMA:

> The evidence at trial was sufficient to establish that Mr. Head not only had an idea about the MDMA manufacturing process but was actually conducting that process himself. So the Court finds that this adjustment is appropriate in this case. The Court makes a specific finding that the defendant's statement that he had no idea about the MDMA manufacturing process does constitute perjury, and, because it does constitute perjury, the defendant also has obstructed justice.

*Id.* at 51 (Page ID #1634).

After considering Head's objections to the PSR, the district court determined Head's sentence. The sentencing judge explained that Head was particularly culpable because he had abused his education and skills: "You stand out from all the other defendants, and you stand out from most defendants that the Court sees in this courtroom, and that's because you are a skilled, technically trained individual with a very, very scarce and rare knowledge." *Id.* at 59 (Page ID #1642). The court determined that it was especially important to consider deterrence in sentencing as an attempt to dissuade similarly educated individuals from abusing their knowledge:

> [B]ecause of this rare skill, the Court deems it important in this case, as opposed to other cases, to deter others with this knowledge from using this knowledge for illicit purposes. The people that sell ecstasy, they can be easily replaced. The people that—the middle people, the money people, they're pretty much interchangeable. The rare knowledge that you have, though, is not interchangeable.
> . . . There are other people, there are not a large number of people, but there are other people who have training in chemistry, training in biology, training in laboratory work, who could also use that knowledge to manufacture ecstasy. And a sentence in this case should be sufficient that those people will not use their specialized knowledge in improper ways.

*Id.* at 60–61 (Page ID #1643–44).  After considering the other §3553(a) factors, the district court sentenced Head to 144 months of imprisonment.  *Id.* at 61 (Page ID #1644).

On appeal, both Kamper and Head challenge the procedural and substantive reasonableness of their sentences.  They argue that the district court erred in applying enhancements for aggravating role and obstruction of justice to their sentences.  They also argue that the district court erred when it refused to reject the MDMA-to-marijuana ratio used in the Guidelines.

## II.  STANDARD OF REVIEW

We review challenges to the reasonableness of a sentence for abuse of discretion.  *United States v. Brooks*, 628 F.3d 791, 795 (6th Cir. 2011).  Sentences must be both procedurally and substantively reasonable.  *United States v. Castilla-Lugo*, 699 F.3d 454, 458–59 (6th Cir. 2012) (citing *United States v. Haj-Hamed*, 549 F.3d 1020, 1023 (6th Cir. 2008)).  We first evaluate whether the district court committed "significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence."  *Gall v. United States*, 552 U.S. 38, 51 (2007).  The district court must provide a statement of reasons sufficient "to satisfy the appellate court that [it] has considered the parties' arguments and has a reasoned basis for exercising [its] own legal decisionmaking authority."  *Rita v. United States*, 551 U.S. 338, 356 (2007).  Although the district court need not explicitly discuss each § 3553(a) factor, the statement of reasons must demonstrate that the district court at least considered each factor when determining the appropriate sentence.  *United States v. Battaglia*, 624 F.3d 348, 351 (6th Cir. 2010).

If the sentence is procedurally sound, we next evaluate whether it was substantively reasonable.  "The essence of a substantive-reasonableness claim is whether the length of the sentence is 'greater than necessary' to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a)."  *United States v. Tristan-Madrigal*, 601 F.3d 629, 632–33 (6th Cir. 2010).  A sentence may be substantively unreasonable if the district court "fail[ed] to consider relevant sentencing factors" or gave an "unreasonable amount of weight to any pertinent factor."  *United States v. Camacho-Arellano*, 614 F.3d 244, 247 (6th Cir. 2010).  In considering whether the

§ 3553(a) factors justify the sentence, we apply a presumption of reasonableness to within-Guidelines sentences. *United States v. Vonner*, 516 F.3d 382, 389–90 (6th Cir. 2008) (en banc).

### III.  KAMPER

**A.  Procedural Reasonableness**

**1.  MDMA-to-Marijuana Ratio**

Kamper first argues that the district court erred by misunderstanding its authority to reject the MDMA-to-marijuana ratio embodied in the Sentencing Guidelines.  As a threshold matter, we must determine the appropriate standard of review to apply.  Although we ordinarily review challenges to the procedural reasonableness of a sentence under the deferential abuse-of-discretion standard, procedural claims raised for the first time on appeal are reviewed for plain error. *Vonner*, 516 F.3d at 386.  The government argues that, by failing specifically to assert an objection after the court's inquiry, *see United States v. Bostic*, 371 F.3d 865, 872–73 (6th Cir. 2004), Kamper neglected to preserve his procedural argument that the sentencing court failed to address the merits of his substantive arguments regarding the MDMA-to-marijuana ratio.  K.R. 224 (Sentencing Hr'g Tr. at 139) (Page ID #1049); *see United States v. Simmons*, 587 F.3d 348, 353–58 (6th Cir. 2008) (finding plain-error review appropriate for a claim that the district court erred in failing to address the defendant's argument for varying downward based on the crack-to-powder cocaine ratio); *see also United States v. Staten*, 435 F. App'x 422, 426 & n.1 (6th Cir. 2011); *United States v. Lamb*, 431 F. App'x 421, 423–24 (6th Cir. 2011).

Kamper does not argue that the district court committed procedural error by failing even to consider his arguments; such an objection must be preserved by an objection after the sentencing because it "cannot be 'preserved' in advance of a sentencing event that has yet to occur." *See Lamb*, 431 F. App'x at 424.  Rather, Kamper argues that the court abused its discretion by misunderstanding its authority to reject the Guidelines ratio.  Although he never explicitly argued that the district court misunderstood its authority, Kamper raised several arguments at the sentencing hearing explaining why the district court had authority to reject the Guidelines equivalency ratio, and it is clear that the district court considered those arguments. *See United States v. Herrera-Zuniga*, 571 F.3d 568, 580 (6th Cir. 2009) (reasoning that the issue-

preservation analysis should be conducted "'with an eye to the realities of the facts and circumstances of each sentencing proceeding'" (quoting *Vonner*, 516 F.3d at 391)).  No explicit objection after the *Bostic* inquiry was required here because Kamper had already argued and the district court had explicitly addressed the issue.  *Simmons*, 587 F.3d at 355 ("[I]t is unnecessary for a party to repeat previously made objections in order to secure the lower standard of review on appeal.").  Therefore, we review the district court's ruling on this issue for abuse of discretion.

In *Kimbrough v. United States*, 552 U.S. 85 (2007), the Supreme Court considered whether district courts could use their discretion to reject the crack/powder cocaine sentencing ratio underlying the Guidelines based on policy disagreements.  The Court reasoned that, after its decision in *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines became merely advisory and that courts could therefore "vary from Guidelines ranges based solely on policy considerations."  *Kimbrough*, 552 U.S. at 101 (internal quotation marks and alteration omitted).  Therefore, the Court held that "it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case."  *Id.* at 110.

In so holding, the Court responded to a number of arguments regarding the potential deleterious consequences of allowing such a practice.  First, the Court noted that unwarranted sentencing disparities remained a concern, but concluded that "advisory Guidelines combined with appellate review for reasonableness and ongoing revision of the Guidelines in response to sentencing practices will help to 'avoid excessive sentencing disparities.'"  *Id.* at 107 (quoting *Booker*, 543 U.S. at 264).  The Court also recognized that the Sentencing Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise."  *Id.* at 109 (internal quotation marks omitted).  However, the Court determined that sentencing judges are in a superior position to apply the § 3553(a) objectives to the particular facts of the individual case.  *Id.*  Thus, while recognizing valid institutional and equality concerns, the Supreme Court nonetheless concluded that district courts have the authority to reject a Guidelines equivalency ratio if they conclude that it

ordinarily produces sentences greater than necessary to achieve the purposes of sentencing. *See Spears v. United States*, 555 U.S. 261, 264 (2009) (announcing that the "point of *Kimbrough* [was] a recognition of district courts' authority to vary from the crack cocaine Guidelines based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case").

Once a district court has rejected a Guidelines ratio, however, it must find some alternative basis upon which to calculate the sentence. Therefore, the Supreme Court recognized that the rejection of one ratio "necessarily implies adoption of some other ratio to govern the mine-run case." *Spears*, 555 U.S. at 265 ("A sentencing judge who is given the power to reject the disparity created by the crack-to-powder ratio must also possess the power to apply a different ratio which, in his judgment, corrects the disparity.") A sentencing judge thus has the authority both to reject and to replace a Guidelines ratio purely based on his disagreement with the policy justifications underlying the ratio or his determination that the ratio regularly produces unwarranted sentencing disparities.

Although the Supreme Court first announced the "reject and replace" authority in the context of the crack-to-powder cocaine ratio, we have clarified that district judges may exercise their discretion to reject Guidelines ratios because of policy disagreements in "all aspects of the Guidelines." *United States v. Cole*, 343 F. App'x 109, 115 (6th Cir. 2009); *see also Herrera-Zuniga*, 571 F.3d at 585 ("We thus see no reason to limit the authority recognized in *Kimbrough* and confirmed in *Spears* to the crack-powder cocaine context."). We have recognized courts' authority in appropriate cases to reject the Guidelines sentencing ranges based on articulated policy disagreements in a range of contexts. *See, e.g.*, *United States v. Bistline*, 665 F.3d 758, 763–64 (6th Cir. 2012) (reasoning that courts have the authority to reject the Guidelines range selected by Congress for child pornography offenses, but concluding that the district court "did not seriously attempt to refute" the policy and value judgments underlying the Guidelines); *Camacho-Arellano*, 614 F.3d at 250 (recognizing the court's authority to vary from the Guidelines because it disagreed with policy judgments that created wide sentencing disparities between jurisdictions with fast-track programs and jurisdictions without such programs); *Herrera-Zuniga*, 571 F.3d at 583–86 (permitting a district court to reject the Guidelines range for

illegal reentry offenses because it concluded that the sentences applied to such offenses were too low).  Therefore, we conclude that the district court had the power to exercise his discretion to reject the MDMA-to-marijuana ratio embedded in the Guidelines based on a reasoned policy disagreement.  The district court erred by concluding, to the contrary, that "[i]t is not clear to the Court this broad reject-and-replace power does (or should) exist outside the universe of crack-to-powder ratio cases." *Kamper*, 860 F. Supp. 2d at 604.

The district court in the instant case misunderstood its authority to reject the Guidelines' MDMA-to-marijuana equivalency ratio and replace it with a more appropriate ratio.  A district court errs when it "fail[s] to appreciate the scope of its discretion" and "indicates that policy disagreements are not a proper basis to vary." *United States v. Johnson*, 407 F. App'x 8, 10 (6th Cir. 2010).  To be sure, the district court is not required to reject the Guidelines range, even if it disagrees with the ratio on policy grounds:  "[T]he fact that a district court *may* disagree with a Guideline for policy reasons and *may* reject the Guidelines range because of that disagreement does not mean that the court *must* disagree with that Guideline or that it *must* reject the Guidelines range if it disagrees." *Brooks*, 628 F.3d at 800; *see also United States v. Thannavong*, 533 F. App'x 589, 592–94 (6th Cir. 2013) (affirming a district court's conclusion that the Guidelines' MDMA-to-marijuana ratio should not be rejected because it was not persuaded that the policy arguments undermining the Guidelines range outweighed other § 3553(a) factors).  However, the district courts "are not free to cede their discretion by concluding that their courtrooms are the wrong forum for setting a [new] ratio." *Johnson*, 407 F. App'x at 10.  The district court "must not rely on the Guidelines for reasons that *Kimbrough* rejected, such as institutional competence, deference to Congress, or the risk that other judges will set different ratios." *Id.* at 11–12 (footnote omitted).[2]

---

[2]This directive is true even when Congress has expressed empirical or value judgments that underlie the selected Guidelines ratio.  In the context of child-pornography crimes, we have cautioned that "when a guideline comes bristling with Congress's own empirical and value judgments—or even just value judgments—the district court that seeks to disagree with the guideline on policy grounds faces a considerably more formidable task than the district court did in *Kimbrough*." *Bistline*, 665 F.3d at 764.  In the instant case, Congress directed the Sentencing Commission in 2000 to increase the penalties connected to MDMA crimes based on the perceived harmfulness of the drug.  Children's Health Act of 2000, Pub. L. No. 106-310, § 3663(b)(1), 114 Stat. 1101, 1243 (2000).  Therefore, although a district court must find particularly persuasive policy reasons to reject the MDMA Guidelines range, it nonetheless still has the authority to do so. *See Bistline*, 665 F.3d at 763.

At Kamper's sentencing hearing and in the sentencing memorandum issued following the hearing, the district court made inconsistent findings regarding its authority to reject the MDMA-to-marijuana ratio embraced by the Guidelines.[3] The district judge explicitly recognized that "*Kimbrough* authorizes a federal district court judge to reject a policy judgment by the Commission." *Kamper*, 860 F. Supp. 2d at 604; *see also* K.R. 224 (Sentencing Hr'g Tr. at 118) (Page ID #1028). However, his analysis of the proper institutional roles of the courts and the Sentencing Commission indicates that he actually believed it was not proper to vary from the Guidelines ratio based on policy disagreements. *Kamper*, 860 F. Supp. 2d at 603–09; K.R. 224 (Sentencing Hr'g Tr. at 58–62) (Page ID #968–72) ("The Court concludes that the Sentencing Commission is in a better position than this Court to take into account all of the various value judgments involved in adopting a particular guideline."). Specifically, the district court chose not to vary because of concerns about the separation of powers, *Kamper*, 860 F. Supp. 2d at 603–04, institutional competence, *id.* at 606–07, and sentencing variation among district judges, *id.* at 605. These are the very constitutional and institutional objections rejected by the Supreme Court in *Kimbrough*. We have held that, when a district judge explicitly acknowledges his authority to vary but also makes "remarks about the proper role of courts [that] reveal his belief that a policy disagreement is not a proper basis for a judge to vary," the resulting sentence is procedurally unreasonable. *Johnson*, 407 F. App'x at 10. Here, the sentencing materials read as a whole demonstrate that the district court erred by failing appropriately to recognize his authority to reject the MDMA-to-marijuana ratio embedded in the Guidelines.

When the district court misunderstands its own authority, ordinarily grounds exist warranting remanding the case for resentencing. *See United States v. Vandewege*, 561 F.3d 608, 610 (6th Cir. 2009). However, no remand is required if the record establishes that the district court "would have imposed the same sentence if [it] had known of [its] discretion to vary categorically from the . . . Guidelines based on a policy disagreement." *United States v. Johnson*, 553 F.3d 990, 996 n.1 (6th Cir. 2009); *United States v. Hazelwood*, 398 F.3d 792, 801 (6th Cir. 2005) (finding that the district court erred in sentencing the defendant, but concluding

---

[3]Although both the transcript of the sentencing hearing and the written memorandum contain internal inconsistencies, they are not in conflict with each other. Therefore, we need not grant primacy to the oral sentence. *See United States v. Penson*, 526 F.3d 331, 334 (6th Cir. 2008).

that the error "does not necessarily mean that he is entitled to resentencing" if it was harmless).
The district court made several statements during the hearing and in its written memorandum
indicating that, even had it recognized its authority to reject the Guidelines ratio on policy
grounds, it would not have done so. *See Kamper*, 860 F. Supp. 2d at 605 ("[T]he Court has no
categorical disagreement with the MDMA-to-marijuana ratio."); *id.* at 606 ("Even if *Kimbrough*
and *Spears* permit a district court judge to reject a drug equivalency ratio . . . on policy grounds
and substitute a new ratio for the rejected one, the Court would not exercise that power here.");
*id.* at 609 ("Thus, in the face of considerable uncertainty about both the science and policies
underlying the MDMA-to-marijuana ratio and the sentencing practices of federal district courts
in MDMA cases . . . the Court, even assuming it had the power to legislate a new MDMA-to-
marijuana ratio, must decline Kamper's invitation to do so.").[4]   Thus, although the district court
erred by failing properly to recognize its authority to reject and replace the Guidelines ratio, the
error was harmless because the record makes clear that the district court would have imposed the
same sentence even had it understood its authority.

Although remand is not necessary in this case, we note that our opinion does not
foreclose a district court, after appropriate analysis, from sentencing a defendant convicted of an
MDMA offense either in accordance with the current Guidelines range or in accordance with the
district court's evaluation of proper policy arguments. District courts still have considerable
discretion during sentencing to accept or reject a defendant's policy arguments for rejecting a
Guidelines range. However, a district court must base any decision not to replace the Sentencing
Commission's ratio on reasoned policy arguments, not on its lack of authority or institutional
competence, separation-of-powers concerns, or any other grounds that suggest the district court
cannot or should not reject an aspect of the Guidelines. That is, a district court confronted with
an argument that the MDMA Guidelines range is flawed must confront the merits of any
scientific or policy-based arguments and articulate its reasons for rejecting such arguments. *See*

---

[4]Although not publicly available at the time of Kamper's sentencing, the United States Sentencing
Commission now publishes statistics demonstrating the rate of variance from the Guidelines range for drug
offenders by type of drug. In 2012, only 27.9% of judges who sentenced MDMA offenders gave within-guidelines
sentences. U.S. Sentencing Commission's Interactive Sourcebook, Sentences Relative to the Guideline
Range for Drug Offenders in Each Drug Type, http://isb.ussc.gov/content/pentaho-
cdf/RenderXCDF?solution=Sourcebook&path=&action=table_xx.xcdf&template=mantle&table
_num=Table45. Because this statistical information was not available to the district court, we may not consider it
on review. *See United States v. Murdock*, 398 F.3d 491, 499–500 (6th Cir. 2005).

*Thannavong*, 533 F. App'x at 592–93. Because we conclude that the district court's error here is harmless in light of the district court's statements that it would choose to use the Guidelines ratio and impose the same sentence in any event, we turn to Kamper's alternative arguments regarding the reasonableness of his sentence.

## 2.  Enhancement for Obstruction of Justice

Kamper also argues that the district court erred in imposing a sentencing enhancement for obstruction of justice and in withholding acceptance-of-responsibility credits based upon an admission by Kamper that he told other inmates in his jail pod that St. Onge was a "rat" and a "snitch." We review the district court's findings of fact for clear error, but determine de novo "whether specific facts actually constitute an obstruction of justice." *United States v. Bazazpour*, 690 F.3d 796, 805 (6th Cir. 2012). We review the district court's determination that a defendant has not accepted responsibility for the offense for clear error. *United States v. Coss*, 677 F.3d 278, 290 (6th Cir. 2012).

An enhancement for obstruction of justice is appropriate if a defendant received an adjustment under § 3B1.1 for aggravating role and "engaged in witness intimidation, tampered with or destroyed evidence, or otherwise obstructed justice in connection with the investigation or prosecution of the offense." U.S.S.G. § 2D1.1(b)(14)(D). A defendant has obstructed justice when his "statements can be reasonably construed as a threat, even if they are not made directly to the threatened person." *United States v. Jackson*, 974 F.2d 104, 105 (9th Cir. 1992). At the time Kamper identified him as a snitch, St. Onge was cooperating with the government and anticipated being called as a witness at Head's trial. St. Onge testified that, after Kamper began spreading rumors about him, the other inmates became "rile[d] up" and St. Onge became concerned about them "taking a physical action" against him or ostracizing him. K.R. 224 (Sentencing Hr'g Tr. at 93–94) (Page ID #1003–04). The district court made the factual finding that Kamper had enough general experience when he spread rumors about St. Onge to know that snitches "are not well-received in jails and in prisons." *Id.* at 84 (Page ID #994). Had the district court based its finding solely on the assumption that Kamper had been exposed to popular media and news regarding the treatment of informants in jail, we might have found error. However, Kamper's letter to Head, written after he told other inmates that St. Onge was cooperating with

the government, supports the district court's finding and demonstrates Kamper's knowledge that "no one likes a rat in jail."  K.R. 172 (Kamper Ltr.) (Page ID #445).  Therefore, Kamper's decision to inform other inmates that St. Onge was cooperating with the government can be reasonably construed as an indirect threat, and the district court did not err in applying the sentencing enhancement.

Moreover, we uphold the district court's decision to withhold an adjustment for acceptance of responsibility.  Witness intimidation "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct."  U.S.S.G. § 3E1.1, cmt. 4.  The district court reasoned that Kamper's behavior in jail outweighed his willingness to enter a guilty plea and admit to the facts of the conspiracy:  "The acts of putting in jeopardy the safety and/or life of another individual speaks a lot more than the defendant's entering a guilty plea, the defendant being compliant while on supervised release, and the defendant agreeing to the facts in the factual basis."  K.R. 224 (Sentencing Hr'g Tr. at 102–03) (Page ID #1012–13).  Considering the "great leeway" granted to district courts when determining whether a defendant deserves credit for accepting responsibility, *United States v. Gregory*, 315 F.3d 637, 640 (6th Cir. 2003) (citation omitted), we conclude that the district court did not clearly err.

### 3.  Additional Procedural-Reasonableness Arguments

Finally, Kamper argues that the district court committed procedural error by failing to consider and adequately to explain why it rejected several of his arguments for leniency.[5] Specifically, Kamper asserts that the district court neglected to explain how it incorporated into the sentence his arguments that (1) the Guidelines ratio was flawed and without empirical support, (2) he was less culpable than similarly situated defendants because he was motivated by desperation in the face of debt rather than by greed, and (3) his personal characteristics, education, and employment history indicated a lesser need for incapacitation.  Kamper's first purported error, regarding the MDMA-to-marijuana ratio, is clearly without merit.  The district court addressed Kamper's argument that the ratio is flawed at great length and explained that, to

---

[5]Kamper also argues for the first time in his reply brief that the district court erred by imposing a sentencing enhancement for his aggravating role as the organizer or leader of the conspiracy pursuant to U.S.S.G. § 3B1.1(a).  Kamper Reply Br. at 27–30.  Because he failed to raise this argument in his initial appellate brief, we deem it waived. *United States v. Perkins*, 994 F.2d 1184, 1191 (6th Cir. 1993).

the extent it found that the Guidelines ratio produced a sentence greater than necessary, it would vary downward.  K.R. 224 (Sentencing Hr'g Tr. at 118) (Page ID #1028).

Kamper failed to raise the other two arguments before the district court, and they are thus reviewed for plain error.  *Bostic*, 371 F.3d at 872–73.  Although the district court did not discuss thoroughly each of Kamper's arguments, its reasoning was sufficient to show that it considered Kamper's motivations and personal characteristics when determining his sentence.  The district court's failure to respond explicitly to Kamper's motivation argument is not unreasonable because "a sentencing judge is not required to explicitly address every mitigating argument that a defendant makes, particularly when those arguments are raised only in passing." *United States v. Madden*, 515 F.3d 601, 611 (6th Cir. 2008).  Furthermore, the record clearly indicates that the district court considered Kamper's personal characteristics, but ultimately concluded that Kamper's education and background supported a longer sentence, rather than a reduced sentence. K.R. 224 (Sentencing Hr'g Tr. at 132) (Page ID #1042) ("[Kamper's] involvement with these defendants is much, much more serious than the typical leader or organizer of a conspiracy, because of the difference in [his] leadership, [his] age, [his] experience, [and his] abilities."). The district court's disagreement with Kamper regarding how his personal characteristics should factor into the § 3553(a) analysis is not error, so long as the record shows that the district court considered the appropriate factors.  *United States v. Hogan*, 458 F. App'x 498, 504 (6th Cir. 2012).  Therefore, we find no error in the district court's explanation of Kamper's sentence.

**B.  Substantive Reasonableness**

Because we find no reversible procedural error, we next turn to Kamper's contention that his sentence is greater than necessary to achieve the appropriate sentencing objectives.  Kamper argues that his sentence was substantively unreasonable because the district court both weighed the Guidelines too heavily despite evidence that they overstate the seriousness of an MDMA offense and failed adequately to consider relevant factors, such as Kamper's motivation and his personal characteristics.  Kamper raises essentially similar arguments regarding the failure to consider § 3553(a) factors as examples of both procedural and substantive error.  "This blurring may result from the fact that such an error can come in at least two forms:  the procedural error of failing actually to consider all the relevant factors, and the substantive error of imposing a

sentence that does not fairly reflect those factors." *Camacho-Arellano*, 614 F.3d at 247 n.1. As with the procedural arguments, Kamper's substantive arguments are without merit. The district court imposed a below-Guidelines sentence that fairly reflects a balance between the seriousness of Kamper's conduct, which led others into crime, and the mitigating circumstances asserted by Kamper, including the flawed Guidelines ratio and his personal characteristics.

Thus, we find neither procedural nor substantive error during Kamper's sentencing hearing. The district court did not abuse its discretion in imposing on Kamper a sentence of 144 months of imprisonment. Accordingly, we affirm the judgment of the district court regarding Kamper.

## IV. HEAD

Head also argues that the district court erred procedurally and substantively when it sentenced him for his role in the conspiracy. On appeal, he adopts Kamper's argument that the district court committed procedural error by failing to recognize its authority to reject the MDMA-to-marijuana equivalency ratio embedded in the Sentencing Guidelines. He also argues that the district court miscalculated his Guidelines range by applying enhancements for obstruction of justice and for his aggravating role as a manager or organizer of the conspiracy. Finally, he makes a number of subsidiary arguments relating to the district court's failure to consider his personal characteristics or to weigh properly the various § 3553(a) sentencing factors.

Head first attempts to join Kamper's argument regarding the lack of empirical support for the MDMA-to-marijuana ratio. However, Head failed to raise this argument before the district court in any capacity: he did not make the ratio argument in his sentencing memorandum, did not raise it at his sentencing hearing, and did not join in Kamper's motion requesting that the district court reject the Guidelines ratio and select a different equivalency ratio. Kamper's assertion of the argument does not by itself preserve the issue for codefendants. Accordingly, we review this issue for plain error. The district court did not discuss the equivalency-ratio issue during Head's sentencing hearing because Head had raised no objection that would prompt the court to do so. However, given our discussion regarding the district court's analysis of this issue

at Kamper's sentencing hearing, we cannot conclude that the elements of the plain-error test are satisfied. *See United States v. Olano*, 507 U.S. 725, 734 (1993).

Head also argues that the district court improperly applied sentencing enhancements for obstruction of justice and his aggravating role in the conspiracy. The Sentencing Guidelines direct the district court to increase a defendant's offense level by two levels if he "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," so long as the obstructive conduct related to the offense of conviction or a closely related offense. U.S.S.G. § 3C1.1. A defendant may obstruct justice by "committing, suborning, or attempting to suborn perjury." *Id.* at cmt. 4(B). However, the sentencing enhancement does not apply to every defendant who testifies and is subsequently convicted. *United States v. Dunnigan*, 507 U.S. 87, 95 (1993). Were that the case, a defendant's constitutional right to testify on his own behalf could be undermined by the prospect that he would be punished at sentencing for doing so. *Id.* at 94–95. Rather, the obstruction-of-justice enhancement applies only if the district court "(1) identif[ies] those particular portions of defendant's testimony that it considers to be perjurious; and (2) either make[s] a specific finding for each element of perjury or, at least, make[s] a finding that encompasses all of the factual predicates for a finding of perjury." *United States v. Lawrence*, 308 F.3d 623, 632 (6th Cir. 2002). Perjury is "(1) a false statement under oath (2) concerning a material matter (3) with the willful intent to provide false testimony." *United States v. Watkins*, 691 F.3d 841, 851 (6th Cir. 2012).

The district court clearly identified which portion of Head's testimony that it believed to be perjurious: Head's claim that he had "no idea" how to manufacture MDMA. H.R. 245 (Sentencing Hr'g Tr. at 51) (Page ID #1634); H.R. 244 (Trial Tr. at 263) (Page ID #1348). The court also made an explicit finding that this statement, made under oath, was false, reasoning that "[t]he evidence at trial was sufficient to establish that Mr. Head not only had an idea about the MDMA manufacturing process but was actually conducting that process himself." H.R. 245 (Sentencing Hr'g at 51) (Page ID #1634). However, the conclusion that the defendant told an "obvious lie" under oath is insufficient to support the sentencing enhancement if the district court does not also make factual findings regarding the other two elements of perjury. *See United*

*States v. Macias-Farias*, 706 F.3d 775, 781–83 (6th Cir. 2013).  The district court failed to make factual findings concerning the materiality of the matter or Head's intent, and we are "not well-placed to make factual findings of perjury in the first instance, even if we believe there is evidence in the record that supports such findings."  *Id.* at 783.  Were we to presume the elements to be satisfied, we would risk undermining a criminal defendant's constitutional right to testify on his own behalf.  We therefore conclude that the district court failed to make the necessary factual findings to support a sentencing enhancement for obstruction of justice.

The district court also erred by applying the sentencing enhancement for Head's aggravating role as a manager or supervisor of the conspiracy.  "This Court has yet to clarify the standard of review when a district court imposes a . . . role enhancement."  *United States v. Melesio*, 532 F. App'x 596, 599 (6th Cir. 2013); *see also Castillo-Lugo*, 699 F.3d at 459.  The district court's application of a U.S.S.G. § 3B1.1 enhancement traditionally has been subject to de novo review for legal conclusions and clear-error review for factual findings.  *United States v. McDaniel*, 398 F.3d 540, 551 n.10 (6th Cir. 2005).  However, the Supreme Court cast doubt on this standard when it held that deferential review applied to a district court's application of § 4B1.2, "[i]n light of the fact-bound nature of the decision."  *Buford v. United States*, 532 U.S. 59, 66 (2001).  We need not resolve the question in the instant case because we conclude that the district court erred in applying the enhancement under either standard.

A district court may increase a defendant's offense level by three levels if he "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(b).  To qualify for this enhancement, a defendant must have managed or supervised "one or more other participants," and not merely the criminal scheme.  *Id.* at cmt. 2; *see also United States v. Gort-DiDonato*, 109 F.3d 318, 321 (6th Cir. 1997).  "[M]anagement or supervision of the property, assets, or activities of the criminal organization may warrant an upward departure but not an enhancement."  *Castilla-Lugo*, 699 F.3d at 460.  Thus, the district court misapplied the law when it concluded that the enhancement applied to Head because he, Kamper, and St. Onge were "jointly the manager or supervisor of the entire operation."  H.R. 245 (Sentencing Hr'g Tr. at 40) (Page ID #1623).

To be sure, the record arguably demonstrates that Head was responsible for directing other individuals in menial tasks, such as holding heavy equipment and cutting foil squares. H.R. 243 (Trial Tr. at 121–22, 152–53) (Page ID #1206–07, 1237–38).  However, the district court erred because it failed to make a factual finding that Head managed or supervised other individuals involved in the conspiracy.  Indeed, the district court implicitly rejected defense counsel's argument that Head was not eligible for the enhancement because he did not exercise control over another person, and instead based its decision on the conclusion that Kamper, Head, and St. Onge created a "three-headed organization" in which they shared control of the *criminal enterprise*.  H.R. 245 (Sentencing Hr'g at 41–42) (Page ID #1624–25).  Therefore, regardless of whether Head actually did supervise other individuals in the conspiracy, the district court erred procedurally by misapprehending the law and applying the aggravating-role enhancement based solely upon Head's management of the criminal activity.  Under either deferential or de novo review, we conclude that the district court erred in applying the aggravating-role enhancement to Head's sentence.

Because the district court erred in imposing these sentencing enhancements as explained above, we conclude that the court miscalculated Head's Guidelines range.  We need not address Head's additional arguments regarding procedural and substantive errors because an incorrect calculation of the defendant's Guidelines range is reversible procedural error.  Accordingly, we vacate Head's sentence and remand for resentencing.

## V.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment with respect to Kamper's sentence but **VACATE** the judgment with respect to Head's sentence and **REMAND** for resentencing of Head.