**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 17-3274
_____

UNITED STATES OF AMERICA

v.

PETER SEPLING,
                    Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(No. 3-11-cr-00195-001)
District Judge:  Hon. A. Richard Caputo

_____

Argued on May 23, 2019

Before: McKEE, SHWARTZ, and FUENTES, *Circuit Judges*

(Opinion filed November 29, 2019)

Sean E. Andrussier
Abbey McNaughton          [**ARGUED**]
Nicolas Rodriguez
Kelsey Smith
Duke University School of Law
210 Science Drive
Box 90360
Durham, NC 27708
          Counsel for Appellant*

*The Court wishes to express its gratitude to the Duke University School of Law Appellate Advocacy Clinic for agreeing to represent Mr. Sepling pro bono. The Court

Stephen R. Cerutti, II
Office of United States Attorney
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108
                    Counsel for Appellee

William S. Houser          [**ARGUED**]
Francis P. Sempa
Office of United States Attorney
235 North Washington Avenue
P.O. Box 309, Suite 311
Scranton, PA 18503
                    Counsel for Appellee

_____

OPINION OF THE COURT
_____

McKEE, *Circuit Judge*

Peter Sepling moved under 28 U.S.C. § 2255 for the District Court to vacate the judgment of sentence imposed following his guilty plea based upon his attorney's alleged ineffectiveness during his sentencing in 2014. Sepling asks us to vacate the order of the District Court denying this motion. We agree that he was prejudiced by his counsel's ineffectiveness and we will therefore vacate the District Court's denial of Sepling's § 2255 motion and remand for further proceedings consistent with this opinion.

expresses particular appreciation to Sean E. Andrussier, Esq., Director of the Appellate Advocacy Clinic, and the clinical law students: Abbey McNaughton (who presented an exceptional oral argument), Nicolas Rodriguez, and Kelsey Smith. Together, they submitted an excellent brief and provided exemplary representation to Mr. Sepling.

## I.    Background

Sentencing Counsel represented Peter Sepling and negotiated a plea agreement with the Government. Pursuant to that Rule 11(c)(1)(C) agreement, Sepling pled guilty to importing gamma butyrolactone (GBL), a schedule I controlled substance analogue, in violation of Title 21, U.S.C. § 952.[1] The agreement provided in part that Sepling's sentence would be calculated without consideration of, or reference to, the career offender section of the Sentencing Guidelines.[2] The plea agreement also stipulated that Sepling would "refrain from any further violations of state, local or federal law while awaiting . . . sentencing under this agreement" and that a failure to abide by the stipulations of the agreement could cause the Government to withdraw it.[3] After the court accepted Sepling's plea, he was released on bond pending sentencing.

Despite the provisions of the plea agreement, Sepling became involved in a conspiracy to import methylone, another Schedule I controlled substance, shortly after he was released on bond. Law enforcement officials arrested him and charged him with conspiracy to import methylone in violation of 21 U.S.C. § 963. A search incident to that arrest uncovered 3 kilograms of the substance and a later investigation revealed that the conspiracy involved approximately ten kilograms of the drug. An Assistant Public Defender was appointed to represent Sepling on the new charges. She negotiated an unwritten agreement with the Government in which the Government agreed to withdraw

---

[1] JA38, 45.
[2] JA53.
[3] JA62-63.

3

the conspiracy charge in exchange for Sepling accepting responsibility for conspiring to import methylone. In addition, the Government agreed that, rather than prosecuting Sepling on the new charges arising from his involvement with methylone, Sepling's involvement would be factored into the sentence he would receive for his prior GBL conviction as relevant conduct. Since Sepling did not face a separate prosecution involving methylone, the Assistant Public Defender ceased representing Sepling once the Government agreed not to prosecute.

Pursuant to the initial plea agreement arising from his involvement with GBL, Sepling's unmodified Guideline range was 27 to 33 months incarceration. His criminal history category did not change after factoring in his subsequent arrest for methylone. However, the relevant conduct involving his subsequent arrest for methylone dramatically increased his base offense level.

"The [Sentencing] Commission has used the sentences provided in, and equivalences derived from, . . . (21 U.S.C. § 841(b)(1)), as the primary basis for the guideline sentences."[4] But that section only offers guidance for sentences involving the most common controlled substances. The Guidelines use the drug conversion table in § 2D1.1 to prescribe sentences for controlled substances not listed in 21 U.S.C. § 841(b)(1)).[5] For controlled substances less common than those in the 2D1.1 conversion table, the sentencing court must select an analogue from the drug conversion table that is

---

[4] U.S. Sentencing Guidelines Manual § 2D1.1 cmt. n.8(A) (U.S. Sentencing Comm'n 2013) [hereinafter U.S.S.G].
[5] *Id*. at cmt. n.8(D).

most analogous to the substance defendant possessed and proceed as if the defendant had actually possessed the analogous substance listed in the conversion table. Sepling's relevant conduct involved methylone, which is not listed in the Guideline table. The Probation Officer preparing Sepling's Pre-Sentence Report (PSR) therefore analogized methylone to Methylenedioxymethamphetamine or "MDMA." MDMA is a more common street drug known as "ecstasy," and the Guidelines specify a sentencing range for MDMA by establishing a ratio to convert it to a comparable amount of marijuana.[6]

The sentencing table conversion for MDMA equates a unit of that drug to 500 units of marijuana. Consequently, the District Court started its sentencing determination using this 500:1 ratio.[7] Sepling believed that he was only responsible for 3 kilograms of methylone. However, the PSR held him responsible for ten kilograms based on information received from the law enforcement officers involved in his subsequent arrest. Using MDMA as the methylone analogue, the PSR suggested that Sepling's relevant conduct for his involvement with methylone was equivalent to conspiring to distribute 5,000 kilograms (five and a half U.S. tons) of marijuana.[8]

---

[6] *Id*. at cmt. n.8(A)(i).

[7] *Id.* at cmt. n.8(D).

[8] This is about the same weight as a large SUV. *See* How Much Does a Large SUV Weigh, https://www.google.com/search?q=how+much+does+a+large+suv+weigh&oq=how+much+does+a+large+suv+weigh&aqs=chrome..69i57.7776j1j7&sourceid=chrome&ie=UTF-8 (last viewed on October 10, 2019).

Under the Guidelines, offenses involving at least 3,000 but less than 10,000 kilograms of marijuana have a base level of 34.[9] After receiving a two-level variance because of an anticipated amendment to the Sentencing Guidelines (Amendment 782, enacted July 18, 2014), Sepling's base level was reduced to 32. The resulting sentencing range was a period of incarceration between 188 months and 235 months. Sentencing Counsel did not object to that sentencing calculation, nor did he file a sentencing memorandum.[10]

During the ensuing sentencing hearing, Sentencing Counsel did object to the ten-kilogram weight assessed against Sepling, but did not take issue with the 500:1 conversion ratio that would drive the sentence pursuant to the 500:1 ratio of ecstasy (the substance determined to be equivalent to the methylone for purposes of "relevant conduct") to marijuana.

During that hearing, Sentencing Counsel informed the court that he had "never heard [of methylone] . . . until [Sepling] got rearrested."[11] Sentencing Counsel then explained that he had attempted to learn about the drug *from the Government*. Counsel further explained that the Government "tried to educate me… as Mr. Sepling tried to educate me. My understanding of the drug, which is very little, is that drug is –he [Sepling] will explain [to] the Court –it's like a watered down ecstasy."[12] The Government also knew next to nothing about methylone.

---

[9] U.S.S.G. § 2D1.1(c)(3).
[10] JA33.
[11] JA76.
[12] JA76-77.

Rather than doing any research into the pharmacological effect of methylone in order to competently represent his client and inform the District Court's application of the Guidelines table, Sentencing Counsel relied upon his client to explain the effects of methylone. Sentencing Counsel thus "decided to outsource to Sepling any discussion of methylone at the hearing."[13] At Sentencing Counsel's request, Sepling offered the following testimony in an attempt to provide some indicia of an appropriate comparison of methylone to more common substances in the Guidelines equivalency table: "It's like ecstasy. If ecstasy is a ten…[t]his stuff is six and lasts about an hour and a half."[14] Then, in a remarkable exchange that is central to this appeal, Sentencing Counsel, the Government, and the District Court all confessed that they did not possess any substantive knowledge of methylone:

> **The Court**: … [A]lthough he's an addict and although it's a controlled substance, the Methylone is driving [the Sentencing Guidelines calculation.] And that's a serious—that's a serious business because I know—I read about ecstasy. I don't know anything about Methylone, but I will accept the fact that it's somewhat less of an impact than ecstasy. I assume that's correct.
> **Government**: I can't answer that, Judge.
> **The Court**: You can't answer that, no?
> **Sentencing Counsel**: I don't know either, Judge.
> **The Court**: Neither do I. But in any event, it's a controlled substance. It's mind altering. It affects people's behavior. It's not a good thing. So I will consider that.[15]

Of course, all controlled substances are regulated because they are not "a good thing," at least insofar as they are used recreationally rather than medicinally pursuant to a doctor's

---

[13] Appellant Brief 17.
[14] JA80.
[15] JA92.

7

supervision.  They are also all potentially "mind altering" and "affect[] people's behavior." However, Sentencing Counsel made no attempt to provide any information specific to methylone that would have reduced the ratio of 500:1 which drove his client's sentence even though the court appropriately confessed to knowing nothing about methylone—other than the fact that it was listed as a controlled substance.

The District Court sentenced Sepling to a period of incarceration of 102 months. In sentencing him, the court explained, "[y]ou've committed a serious crime here, and it's—in particular the methylone and that you put people in harm's way, and this is why I'm sentencing you."[16]

Sepling thereafter filed a *pro se* motion under 28 U.S.C. § 2255 to set aside or correct his sentence based upon Sentencing Counsel's alleged deficient representation, which the District Court denied.[17]

## II.     The Sixth Amendment

In *Strickland v. Washington*, the Supreme Court elaborated upon "the constitutional requirement of effective assistance" of counsel.[18] The Court explained that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper function of the adversarial process that the trial cannot be relied on as having produced a just result."[19] Two factors are crucial to determining if defense counsel's assistance falls short of the constitutional guarantee. "First, the

---

[16] JA94.
[17] JA108-138.
[18] *Strickland v. Washington*, 466 U.S. 668, 686 (1984).
[19] *Id*.

defendant must show that counsel's performance was deficient…. Second, the defendant must show that the deficient performance prejudiced the defense."[20]

In denying Sepling's § 2255 petition, the District Court found that Sentencing Counsel's performance was not deficient. The District Court explained: "Although sentencing counsel acknowledged that he knew little about methylone, he appropriately likened the drug to a 'watered down ecstasy.'"[21] The District Court concluded that because Sentencing Counsel's statements regarding methylone were consistent with Sepling's, Sepling could not now demonstrate any deficient performance. Similarly, the District Court found that Sepling also could not establish prejudice under *Strickland's* second prong because the court, in sentencing Sepling, determined that the Guidelines were not fair and granted him a substantial downward variance.[22] The District Court denied the motion without a hearing and then denied Sepling's request for a certificate of appealability.

## III. Arguments on Appeal[23]

In this appeal, Sepling again asserts that his Sentencing Counsel provided ineffective assistance by failing to investigate and educate himself and the court about

---

[20] *Id*. at 687.

[21] JA13.

[22] JA14.

[23] The District Court exercised jurisdiction over Sepling's petition for post-conviction relief under 28 U.S.C. § 2255. We exercise jurisdiction over this appeal under 28 U.S.C. § 2253(a) and 28 U.S.C. § 1291. Our review of the District Court's assessment of whether counsel's "performance was deficient" and whether "deficient performance prejudiced the defense" is plenary. *United States v. Jenkins*, 333 F.3d 151, 153 (3d Cir. 2003).

methylone, the substance driving his sentence, or MDMA, its guideline analogue. Sepling adds that by advising him that he had no appealable issues, Sentencing Counsel was again ineffective. The Government argues that Sepling's sentence was not based on the Guidelines, but instead on the sentencing factors as articulated in 18 U.S.C. § 3553(a) and, therefore, his claims of ineffective assistance of counsel are frivolous. The Government also argues that Sentencing Counsel achieved a downward variance from the Guidelines' suggested sentence and therefore could not have been constitutionally derelict.

## IV. Discussion

It is now firmly established that a defendant's constitutional right to effective representation extends to sentencing hearings.[24] The fact that counsel's dereliction may only have resulted in a comparatively "small" increase in the amount of time a defendant is incarcerated neither negates nor lessens the Sixth Amendment's guarantee. "Authority does not suggest that a minimal amount of additional time in prison cannot constitute prejudice."[25] Moreover, since *Strickland,* the Supreme Court has explicitly stated that "any amount of actual jail time has Sixth Amendment significance."[26] Indeed, an interval that may appear to be insignificant to those of us in air-conditioned courtrooms, who return to the warmth and comfort of our homes each night, may be quite oppressive and punitive to someone confined in the sterile isolation of a prison cell situated behind

---

[24] *Glover v. United States,* 531 U.S. 198 (2001).
[25] *Id.* at 203.
[26] *Id.*

concrete walls and razor wire. Accordingly, if Sepling can show that Sentencing Counsel was constitutionally ineffective, he can then satisfy the prejudice prong of *Strickland* if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the [sentencing] would have been different."[27]

## A. Sentencing Counsel's Performance

We have no problem concluding that Sentencing Counsel's representation here fell far "below an objective standard of reasonableness."[28] As noted above, the relevant conduct involving methylone, incorporated into Sepling's sentencing for his involvement with GBL, was the driving factor in the calculation of Sepling's base level under the Sentencing Guidelines and the District Court's sentence. During the sentencing hearing, Sentencing Counsel challenged only the weight of methylone used to calculate Sepling's Guideline sentence.[29] Although Sentencing Counsel argued that Sepling's relevant conduct should have been based on the 3 kilograms he was apprehended with, without consideration of the additional 7 kilograms involved in the methylone conspiracy, he made absolutely no effort to challenge the court's reliance on the 500:1 ratio derived from comparing methylone to MDMA. Sepling argues that, at a minimum, Sentencing Counsel was required to undertake a sufficient investigation of methylone to avoid a sentence derived from the selection of a purportedly false equivalent in the Guideline

---

[27] *Strickland*, 466 U.S. at 694.

[28] *Id.* at 688.

[29] JA71-72 (arguing that the ten-kilogram weight came from Sepling's coconspirators and that therefore the Government must produce those coconspirators to establish that Sepling possessed ten kilograms of methylone).

11

tables that would unfairly and inaccurately inflate Sepling's sentence. We agree. Sentencing Counsel's failure to develop even a rudimentary understanding of methylone and how it compares to MDMA precluded him from assessing whether MDMA was an appropriate analogue, making a compelling, fact-based argument about the seriousness of methylone, or arguing in favor of a smaller ratio than 500:1 as a starting point for crafting an appropriate sentence.

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range,"[30] but it is a responsibility of counsel to ensure that the presentencing report's calculations are correct and that the court has the information needed to conduct a fair sentencing hearing. While the Supreme Court has consistently noted the importance of pre-sentencing hearing investigations,[31] this does not absolve sentencing counsel of the duty to make an independent investigation into the basis of a client's sentence. In *Strickland,* the Supreme Court advised courts to draw from "[p]revailing norms of practice as reflected in American Bar Association standards and the like, *e.g.,* ABA Standards for Criminal Justice 4-1 to 4-8.6," in determining what is required of counsel.[32] Not surprisingly, the ABA Standards at the time of Sepling's sentencing advised that counsel "should present to the court any ground which will assist in reaching a proper disposition favorable to the accused" and "be prepared to

---

[30] *Gall v. United States*, 552 U.S. 38, 49 (2007).
[31] *See, e.g., Wiggins v. Smith,* 539 U.S. 510 (2003); *see also Williams v. Taylor*, 529 U.S. 362 (2000).
[32] *Strickland*, 466 U.S. at 688.

12

supplement or challenge [a presentence report] if necessary."[33]Although we certainly

respect and appreciate the role of the Probation Office in preparing PSRs, the Probation

Officer is an officer of the court and counsel cannot delegate the solemn responsibility of

representing a client to a representative of the Probation Office. Because methylone is not

amongst the substances listed in 2D1.1, Sentencing Counsel should have been

sufficiently informed about methylone to evaluate the Probation Officer's selection of

MDMA as an analogue for sentencing purposes. Methylone may be considered an

analogue of MDMA if it has "a stimulant, depressant, or hallucinogenic effect on the

central nervous system that is substantially similar to the stimulant, depressant, or

hallucinogenic effect on the central nervous system."[34] "In determining the appropriate

sentence, the court also may consider whether the same quantity of analogue produces a

greater effect on the central nervous system than the controlled substance for which it is

an analogue."[35]

 We realize, of course, that "[a] fair assessment of attorney performance requires

that every effort be made to eliminate the distorting effects of hindsight, to reconstruct

the circumstances of counsel's challenged conduct, and to evaluate the conduct from

counsel's perspective at the time."[36] Nevertheless, it is clear from the transcript of the

---

[33] ABA Standards for Criminal Justice Prosecution Function and Defense Function 4-8.1(b) (3d ed. 1993), available at https://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards/prosecution_defense_function.pdf.
[34] *See* U.S.S.G. § 2D1.1 cmt. n. 6 (2013) (adopting the definition of "controlled substance analogue" from 21 U.S.C. § 802(32)(A)(ii)).
[35] *Id*.
[36] *Strickland*, 466 U.S. at 689.

13

sentencing proceeding that Sentencing Counsel's stewardship "was not colorably based on tactical considerations but merely upon a lack of diligence."[37] Sentencing Counsel quite candidly informed the court that he knew nothing about methylone. Moreover, it is clear from the sentencing proceeding that he made absolutely no attempt to sufficiently inform himself about whether methylone "has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to the stimulant, depressant, or hallucinogenic effect on the central nervous system of [MDMA]," or "[w]hether a lesser or greater quantity of the controlled substance not referenced in this guideline is needed to produce a substantially similar effect on the central nervous system as [MDMA]."[38] Unsurprisingly, Sentencing Counsel was ill-equipped to challenge the 500:1 ratio that resulted from determining that MDMA or ecstasy was analogous to methylone.

Congress enacted the Ecstasy Anti-Proliferation Act in 2000 in response to demands that it address the rapidly escalating abuse of ecstasy.[39] Prior to enactment of that Act, the Guidelines had a ratio of 35:1 for ecstasy offenses.[40] The Sentencing Commission responded to the demands by increasing the MDMA ratio from 35:1 to 500:1.[41] A reasonable inquiry into the then-current research on the issue would have

---

[37] *United States v. Gray*, 878 F.2d 702, 712 (3d Cir. 1989).

[38] U.S.S.G. § 2D1.1 cmt. n. 6.

[39] Ecstasy Anti-Proliferation Act of 2000, Pub. L. No. 106-310, § 3662, 114 Stat. 1101, 1241 (2000).

[40] U.S. Sentencing Comm'n, *Report to Congress: MDMA Drug Offenses, Explanation of Recent Guideline Enhancement* 6 (May 2001).

[41] *Id*.

allowed Sentencing Counsel to argue that the response was exaggerated.[42] During the

public comment period on the proposed ratio, the Federation of American Scientists

issued a statement claiming there is "no justification, either pharmacologically or in

policy terms" for the suggested increase.[43] The MDMA ratio has also drawn intense

criticism since its enactment. Shortly after it went into effect, a scientist upon whose

research the Commission relied heavily to support the 500:1 ratio[44] was forced to retract

multiple studies, including a study allegedly proving that a single night of taking MDMA

may cause brain damage.[45] The scientist had mistakenly used methamphetamine instead

of ecstasy in his research, claiming the vials were mislabeled.[46] Sentencing Counsel also

had access to a host of later scientific and academic research supporting an argument that

---

[42] We offer the following only to show the arguments and resources that were reasonably available to Sentencing Counsel at the time of Sepling's sentencing. While Sentencing Counsel was not constitutionally required to investigate each one of these resources or to make each one of these arguments, his failure to make any of these arguments or failure to make any investigation to educate himself about the substance at issue so undermines our confidence in the sentence that was imposed as to establish prejudice under *Strickland* and render his performance constitutionally deficient. Although these materials are not contained in the record, they were available when Sepling was sentenced and we offer them only to illustrate the kind of research that Sentencing Counsel could have brought to the District Court's attention.

[43] Amanda Kay, Comment, *The Agony of Ecstasy: Reconsidering the Punitive Approach to United States Drug Policy*, 29 Fordham Urban L.J. 2133, 2172 (2002).

[44] U.S. Sentencing Comm'n, *supra* note 40 at 8-9, fn. 15-17 (acknowledging that Dr. Ricaurte's work has been severely criticized by other medical researchers, but explaining that publication in peer-reviewed journals "lends credence to [his] work.").

[45] Donald G. McNeil Jr., *Research on Ecstasy Is Clouded by Errors*, N.Y. Times (Dec. 2, 2003), https://www.nytimes.com/2003/12/02/science/research-on-ecstasy-is-clouded-by-errors.html.

[46] *Id.* The retraction drew public criticism from other prominent scientists who accused Dr. Ricaurte of "playing games with his data" to show that recreational drugs are dangerous and win federal grants, and "running a cottage industry showing that everything under the sun is neurotoxic." *Id*.

MDMA is not as harmful as the Commission proposed when selecting the ratio in 2001.[47]

Further supporting an argument in favor of a downward variance, publicly available data

from the Drug Enforcement Agency showed that, by 2013, "survey, seizure, and

treatment data suggest availability and abuse of [MDMA] may have peaked."[48] Finally,

then-available research shows that MDMA was responsible for significantly fewer

emergency room visits than marijuana or cocaine.[49] The available evidence would have

---

[47] *Id.* (explaining that Dr. Stephen Kish from the Center for Addiction and Mental Health in Toronto, after reviewing all available research on MDMA, concluded that there was no evidence that ecstasy caused Parkinson's-like tremors or any lasting brain damage). *See also* John H. Halpern et al., *Residual Neurocognitive Features of Long-Term Ecstasy Users with Minimal Exposure to Other Drugs*, 106 Addiction 777, 777, 783-84 (2011) (finding "little evidence of decreased cognitive performance" in ecstasy users compared to non-users and cautioning against "ascribing neuropsychological deficits to ecstasy exposure."); Stephen J. Kish et al., *Decreased Cerebral Cortical Serotonin Transporter Binding in Ecstasy Users: A Positron Emission Tomography/[ (11)C] DASB and Structural Brain Imaging Study*, 133 Brain: A J. of Neurology 1779, 1791 (2010) (noting that this study "did not find a global, massive reduction of brain [serotonin transporter] binding" as claimed by previous studies on the neurotoxicity of MDMA); Alyssa C. Hennig, Comment, *An Examination of Federal Sentencing Guidelines' Treatment of MDMA ("Ecstasy")*, 1 Belmont L. Rev. 267, 287-301 (2014) (reviewing scientific studies and social science data on MDMA and concluding that Commission exaggerated the danger of MDMA by relying on unsound science, ignoring available studies showing MDMA likely does not cause lasting brain damage, and overstating social concerns about MDMA use); Amanda Kay, Comment, *The Agony of Ecstasy: Reconsidering the Punitive Approach to United States Drug Policy*, 29 Fordham Urb. L. J. 2133, 2160-64 (2002) (discussing scientific research on MDMA and explaining that, while there is still a lack of consensus in the scientific community on the neurotoxicity of MDMA, media coverage and prevention education are often misleading and scientists have argued that concerns about the effects of MDMA on the brain have previously been overstated).

[48] U.S. Dep't of Justice, *Drug Enforcement Administration: 2013 National Drug Threat Assessment Summary* 17 (Nov. 2013) (noting that only 10% of law enforcement agencies reported high levels of MDMA availability, seizures of MDMA dropped significantly from 2011 to 2012, and use among youths had declined since 2010).

[49] *See* U.S. Dep't of Health and Human Servs., *Drug Abuse Warning Network, 2011: National Estimates of Drug-Related Emergency Department Visits* 26 (2011) (finding

supported a well-reasoned argument from Sentencing Counsel that the 500:1 ratio was not supported by then-current scientific research and seriously overstated the societal threat of MDMA.

Legal research by Sentencing Counsel would also certainly have revealed that the 500:1 ratio resulting from equating MDMA to methylone had been rejected by other courts before Sepling's sentencing. In *United States v. McCarthy*, after a two-day evidentiary hearing that included expert testimony, the court rejected the 500:1 ratio, and instead settled on a 200:1 ratio after "no witness testified that MDMA was more harmful than cocaine."[50] The *McCarthy* court pointed to scientific research undermining the Sentencing Commission's finding that MDMA permanently damages brain.[51] Going a step further, the court criticized the Commission's "opportunistic rummaging" through scientific and empirical evidence to select a 500:1 ratio when then-available research suggested MDMA was responsible for comparatively fewer emergency room visits than marijuana and cocaine, was less addictive than cocaine, and associated with substantially less violence than cocaine.[52] The court concluded that "[t]he Commission's selective analysis is incompatible with the goal of uniform sentencing based on empirical data."[53] In rejecting Sepling's Sixth Amendment claim, the District Court discounted cases

---

that MDMA was responsible for only 1.8% of drug-related emergency room visits in 2011, compared to cocaine with 40.3% and marijuana with 36.4%).

[50] *United States v. McCarthy*, No. 09 Cr. 1136 (WHP), 2011 WL 1991146, at \*4 (S.D.N.Y. May 19, 2011).

[51] *Id.* at \*2.

[52] *Id.* at \*3-4.

[53] *Id*. at \*4.

applying a 200:1 drug equivalency ratio for MDMA.[54] Sentencing Counsel's lack of preparation placed him in a position of being unable to effectively argue that the District Court should nevertheless consider those cases in deciding upon an appropriate ratio. Readily available research would have informed Sentencing Counsel that the 500:1 ratio is arguably much too high for MDMA.

Even if we assume that MDMA is the appropriate analogue for methylone, Sentencing Counsel, in addition to challenging the 500:1 ratio for MDMA, could have argued for a further downward variance based on the properties of methylone. Methylone is a type of synthetic cathinone that was listed as a Schedule I controlled substance in 2013, but was not mentioned in the Sentencing Guidelines until 2018.[55] While the current Guidelines provide that a downward variance from the suggested ratio of 380:1 for synthetic cathinones "may be warranted in cases involving methylone, a substance of which a greater quantity is usually needed to produce an effect on the central nervous system similar to the effect produced by a typical synthetic cathinone,"[56] our inquiry is

---

[54] *See, e.g., United States v. Qayyem*, No. 10 Cr. 19 (KMW), 2012 WL 92287, at *5 (S.D.N.Y. Jan. 11, 2012) ("[T]he 500:1 marijuana equivalency ultimately chosen by the Commission does not accurately reflect the then-existing research, nor is it supported by more recent evidence. The Court therefore adopts a 200:1 MDMA-to-marijuana equivalency.")

[55] *See* U.S. Sentencing Comm'n, U.S. Sentencing Guidelines Manual (2018), Supplement to Appendix C, Amendment 807 (Nov. 1, 2018) (explaining that "[s]ynthetic cathinones…are human-made substances chemically related to cathinone, a stimulant found in the khat plant" and adding a 380:1 conversion ratio for synthetic cathinones to the drug conversion tables); *see also Schedule of Controlled Substances: Placement of Methylone Into Schedule I*, 78 Fed. Reg. 21818-01 (Apr. 12, 2013).

[56] U.S.S.G. § 2D1.1 cmt. 27(D) (2018).

limited to the information that was available to Sentencing Counsel when Sepling was

sentenced in 2014.[57]

The District Court accepted that methylone was "somewhat" less serious than

MDMA.[58] However, Sentencing Counsel could have forcefully argued that methylone

does not have "somewhat less of an impact" than MDMA, but rather is *significantly* less

serious.[59] An appropriate investigation would have revealed that the Drug Enforcement

Administration released a report describing the chemical structure of methylone and

noting that it "was about half as potent as MDMA."[60] Some scientific studies have also

suggested that methylone is less potent than MDMA,[61] causes no lasting serotonin

depletion even after repeated high doses,[62] and poses a low risk of addiction compared to

other controlled substances.[63] Moreover, publicly available data at the time of sentencing

---

[57] *See Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.").

[58] JA92.

[59] *See United States v. Kamper*, 748 F.3d 728, 742 (6th Cir. 2014) (holding that district courts may exercise their discretion "to reject the MDMA-to-marijuana ratio…based on a reasoned policy disagreement").

[60] *See* Drug Enforcement Admin., *Drug & Chemical Evaluation Section, 3,4-Methylenedioxymethcathinone (Methylone)* (October 2013), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/20170310/McAvoy.pdf, pg. 27.

[61] Michael H. Baumann et al., *The Designer Methcathinone Analogs, Mephedrone and Methylone, Are Substrates for Monoamine Transporters in Brain Tissue*, 37 Neuropsychopharmacology 1192, 1200 (2012).

[62] *Id.* at 1201 ("[W]e found that repeated high-dose administration of…methylone produce[s] acute hyperthermia and motor stimulation, but no lasting changes in brain tissue monoamines.").

[63] Lucas Watterson et al., *The Reinforcing and Rewarding Effects of Methylone, a Synthetic Cathinone Commonly Found in "Bath Salts,"* 9 J. Addiction Res. & Therapy 1, 11 (2012) (finding that "methylone possesses a relatively low abuse liability" in an

would have disclosed to Sentencing Counsel that less than one percent of emergency room visits in 2011 involved synthetic cathinones, such as methylone.[64] And that of these visits only 7,578—or about 0.3% of the total visits—were due to synthetic cathinones alone rather than being used in combination with other drugs.[65]

We do not suggest that MDMA and methylone are without harmful effects, which the Government may demonstrate with countervailing empirical evidence at resentencing. Nor do we imply that Sentencing Counsel was constitutionally required to discover and utilize every one of these available resources. Rather, the aforementioned research illustrates the variety of fact- and policy-based arguments in favor of a greater downward variance at Sentencing Counsel's disposal at the time of sentencing.   Yet, it is apparent that he made absolutely no attempt to inform himself of such information or present it to the District Court.

---

animal study and "predict[ing]  that methylone dependence may be possible in a subset of [humans], but that consumption patterns would also generally stay intermittent and typically not advance to compulsive use."). *But see* J.S. Bonano et al., *Abuse-related and Abuse-limiting Effects of Methcathinone and the Synthetic "Bath Salts" Cathinone Analogs Methylenedioxypyrovalerone (MDPV), Methylone and Mephedrone on Intracranial Self-stimulation in Rats*, 231 Psychopharmacology 199, 204-05 (2014) ("[M]ethylone…produced mixed effects that included abuse-related facilitation of low [self-stimulation] rates and abuse-limiting depression of high [self-stimulation] rates.").
[64] U.S. Dep't of Health & Human Servs., Substance Abuse and Mental Health Serv. Admin., *The DAWN Report*, (Sept. 17, 2013), available at https://www.samhsa.gov/data/sites/default/files/spot117-bath-salts-2013/spot117-bath-salts-2013.pdf. While the report does not provide data specific to methylone, Sentencing Counsel could reasonably argue that methylone alone accounts for an even smaller number of emergency room visits since the data encompasses all cathinone drugs combined.
[65] *Id.*

In rejecting Sepling's § 2255 motion, the District Court suggested that Sentencing Counsel's performance did not fall below an objective standard of reasonableness because, "[a]lthough sentencing counsel acknowledged that he knew little about methylone, he appropriately likened the drug to a 'watered down ecstasy'" and "counsel's characterization of the drug was consistent with Petitioner's statements at sentencing."[66]

This misses the point. As the Drug Enforcement Agency has shown, methylone is not only less potent than MDMA, it is also *structurally different* from MDMA. There was no reason for Sentencing Counsel to expect Sepling to appreciate the pharmacological impact of the equivalent weights of the various drugs he may have consumed, or for the court to credit his untutored descriptions of methylone as scientific knowledge.

Moreover, even absent constitutionally diligent research efforts, Sentencing Counsel could have reminded the court that there was no way to know if the street drugs Sepling had a history of using had been adulterated or mixed with something that enhanced or exaggerated the drug's effect on him. There was also no way of knowing the quantity of drug required to produce equivalent effects. Finally, there was no way of knowing if a given drug's effect on Sepling was typical. Yet, not only did Sentencing Counsel fail to object to the court's reliance on Sepling as an expert witness, he actually encouraged his client to testify as such.

---

[66] JA13.

Sentencing Counsel cannot adequately represent a client at a sentencing involving a controlled substance not specified in the Guidelines without undertaking a reasonable inquiry into that substance in order to challenge the ratio set forth in the equivalency table, when appropriate. While a sentencing court "may give weight to any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy,"[67] there was no such indicia of reliability here. Likewise, "lay testimony and circumstantial evidence may be sufficient, without the introduction of an expert chemical analysis, to establish the identity of the substance involved in an alleged narcotics transaction,"[68] but here there was no dispute over the identity of this substance. The knowledge required in this case was both complex and technical. The testimony of a defendant with a history of drug abuse about the kind of high s/he gets from an unspecified quantity of a drug of unknown purity is no substitute for the kind of information that could be provided by an informed defense attorney or from expert testimony that the court may wish to consider. Finally, we can see no justification for Sentencing Counsel not even making an inquiry into how and why the Probation Officer selected MDMA as the appropriate guideline analogue for methylone.

The Sixth Amendment right to effective representation requires that counsel provide the sentencing court with more than the unscientific speculation that was the hallmark of this sentencing hearing when that speculation is detrimental to the client. Yet,

---

[67] *United States v. Wilkinson,* 590 F.3d 259, 269 (4th Cir. 2010).

[68] *United States v. Bryce*, 208 F.3d 346, 353 (2d Cir.1999) (quoting *United States v. Dolan,* 544 F.2d 1219, 1221 (4th Cir.1976)).

here, by Sentencing Counsel's own admission, he appeared before the court, representing a client facing nearly twenty years in prison, without investigating the pharmaceutical qualities or appropriate analogues for the substance driving that sentence.[69] Although we realize that "it is critical that courts be highly deferential to counsel's reasonable strategic decisions and guard against the temptation to engage in hindsight,"[70] no such 'Monday morning quarterbacking' is involved in our decision here as counsel's dereliction is obvious. "Ineffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made."[71]

## B. Prejudice to Sepling

Sepling also satisfies *Strickland's* second prong. The Government argues that, even if Sepling meets the first prong of *Strickland*, he cannot satisfy its prejudice prong because he received a sentence below his Guidelines range. Similarly, the District Court concluded that Sepling was not prejudiced because the court accepted that "methylone [has] somewhat less of an impact than ecstasy" and "the guidelines were more severe than they ought to be and did not 'suit [the court] in terms of fairness.'"[72] However, Sepling sustains his burden under *Strickland* if our confidence in the sentence that he

---

[69] JA76.
[70] *Marshall v. Hendricks*, 307 F.3d 36, 85 (3d Cir. 2002) (internal quotation marks omitted).
[71] *Gray*, 878 F.2d at 711.
[72] JA14.

received is undermined.[73] It is. Properly prepared counsel could have made a strong argument, grounded in readily available research, that methylone is significantly less serious than MDMA. Sentencing Counsel not only failed to raise any such argument, but he even resisted the District Court's suggestion that methylone may not be as dangerous as MDMA. When the District Court invited counsel to confirm that methylone had "somewhat less of an impact than ecstasy," Sentencing Counsel responded: "I don't know."[74] Indeed, he did not.

The District Court, in explaining Sepling's sentence, identified its considerations. First, the court stated that "[t]he sentence [the court imposes] has to reflect the seriousness of this offense."[75] By considering this, the court sought "to avoid unwarranted sentencing differences among defendants who have similar records who have been found guilty of similar crimes."[76] Then the court conceded that, while it had "plenty of comparators on drug distribution and drug sales," for methylone it didn't "really have any comparators."[77] Finally, the court conceded that it could not determine "whether [methylone or MDMA] equate in terms of conversion to marijuana or not."[78] If

---

[73] *Rompilla v. Beard*, 545 U.S. 374, 393 (2005) (holding that the failure to investigate and discover mitigating evidence at the sentencing stage was ineffective assistance of counsel because "mitigating evidence, taken as a whole, might well have influenced the jury's appraisal" of the defendant's culpability and therefore "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing") (internal quotations and citations omitted).

[74] JA92.

[75] JA93.

[76] *Id.*

[77] *Id.*

[78] *Id.*

Sentencing Counsel had provided the kind of information referenced above comparing methylone to MDMA, we are persuaded that there is a sufficient likelihood that Sepling could have received a lesser sentence to undermine our confidence in the outcome of the sentencing proceeding.

Since the Supreme Court decided *United States v Booker*,[79] courts have understood that federal Sentencing Guidelines are advisory, not mandatory. Nevertheless, "sentencing decisions are anchored by the Guidelines."[80] Indeed, at least two district courts applied a 200:1 conversion ratio for MDMA based on policy disagreements with the Guidelines,[81] and one court of appeals held that district courts may exercise their discretion to reject the use of the "MDMA-to-marijuana ratio."[82] We appreciate that the District Court did award a downward variance to Sepling based upon the court's conclusion that the 500:1 ratio derived from using MDMA may well overstate the seriousness of methylone. However, that does not negate the fact that Sepling may have received an even greater variance if Sentencing Counsel had been sufficiently informed about methylone.

A significant variance from an arguably high and inaccurate guideline sentence is not a gift. The District Court expressed a desire to base Sepling's sentence on the seriousness of distributing methylone. It is impossible to review the transcript of the sentencing proceeding without concluding that the District Court did not have sufficient

---

[79] 543 U.S. 220 (2005).
[80] *Peugh v. United States*, 569 U.S. 530, 541 (2013).
[81] *Qayyem*, 2012 WL 92287, at *5; *McCarthy*, 2011 WL 1991146, at *1, 4-5.
[82] *Kamper*, 748 F.3d at 742.

information to assess the actual seriousness of methylone. We therefore cannot dismiss the very real possibility that the court may have been amenable to a further downward variance based upon evidence specific to methylone's reduced effect as compared to MDMA. That is sufficient to "undermine [our] confidence in the outcome." [83]

This does not mean that the District Court had to accept the 35:1 ratio of MDMA to marijuana that existed before the Ecstasy Anti-Proliferation Act of 2000, nor do we suggest that any specific ratio was appropriate. We only conclude that it is sufficiently likely that the District Court would have started with a *substantially* lower ratio than 500:1 in determining an appropriate sentence. That is enough to establish prejudice under *Strickland.* "[A]ny amount of actual jail time has Sixth Amendment significance."[84] And "[i]n most cases a defendant who has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome."[85]

The Government and District Court also claim that Sepling cannot establish prejudice because he was sentenced based upon the court's application of the sentencing factors required under 18 U.S.C. § 3553(a) and not based upon the Guidelines range.[86] However, the District Court itself correctly acknowledged at sentencing that the selection of MDMA as an equivalent substance to methylone was "driving" the Guidelines

---

[83] *Strickland*, 466 U.S. at 694.
[84] *Glover*, 531 U.S. at 203.
[85] *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016).
[86] Gov't Br. at 32-34.

calculation.[87] Moreover, this argument also fails to appreciate that Section 3553(a) clearly states that a court must impose a sentence that is "sufficient but *not greater than necessary*, to comply with the purposes of [sentencing]."[88] This requirement is often referred to as ''the parsimony provision,'' and the Supreme Court has referred to it as the ''overarching instruction'' of Section 3553(a).[89] It is impossible for the District Court to comply with this principle if it does not have a reasonable understanding of the seriousness of the controlled substance at the heart of the sentencing.

Because Sentencing Counsel's dereliction put the District Court in a position where it was literally "flying blind" at sentencing, there was no way for a district court to know if the sentence imposed was the least serious penalty consistent with the Court's objective in imposing the sentence. The District Court's discretion was guided only by the unscientific statements of an abuser of multiple drugs who had no way of knowing if his experience was typical, whether the drugs he was referring to had been adulterated, or what dose of the active ingredient in a given mixture of ingested drugs was required to produce a certain effect on the user. The fact that the District Court acknowledged that methylone may be "somewhat" less severe than its Guidelines analogue of MDMA does not remedy these deficiencies.[90]

---

[87] JA89, 92.

[88] 18 U.S.C. § 3553(a). *See also Booker*, 543 U.S. at 268.

[89] *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

[90] JA92.

27

We conclude that Sentencing Counsel's representation of Sepling at his sentencing hearing was ineffective. Therefore, we need not take up Sepling's second claim that counsel was ineffective for advising him against pursuing an appeal.

## III. Conclusion

For the foregoing reasons, we will vacate the District Court's order denying Sepling's § 2255 motion and remand for further proceedings consistent with this opinion.[91]

---

[91] Upon consideration of the information about methylone and its Guideline analogue, the District Court is not precluded from imposing the same sentence on Sepling if it is satisfied the facts and law support it. *See United States v. Headley*, 923 F.2d 1079, 1085 (3d Cir. 1991) (holding that sentencing counsel rendered ineffective assistance but remanding the matter to the district court so it could consider applicability of an adjustment if it deemed "such an adjustment [was] warranted").