NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0533n.06

No. 24-1778

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Nov 20, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) | COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| BRADLEY SCOTT HEARD, | ) | |
| Defendant-Appellant. | ) ) ) | OPINION |

Before: MOORE, BUSH, and DAVIS, Circuit Judges.

**JOHN K. BUSH, Circuit Judge.** Bradley Scott Heard pleaded guilty to methamphetamine possession with the intent to distribute. The district court sentenced him to 180 months in prison. On appeal, Heard argues that his sentence was procedurally unreasonable. Because the district court acted reasonably and any alleged error was harmless, we **AFFIRM**.

**I.**

Heard has an extensive history of drug trafficking across several states.[1] In June 2023, state troopers stopped a vehicle he was driving in Michigan's Upper Peninsula because the vehicle had a suspended license plate. The vehicle's registered owner was Davelle Blackman, a passenger in the back seat. Blackman waived his Miranda rights and told officers that the vehicle contained drugs belonging to Heard. Blackman also said that Heard was paying him to help transport methamphetamine and that Heard intended to sell the methamphetamine. After a canine unit

---

[1] Heard's federal drug conviction arises from methamphetamine possession in Michigan. His drug-trafficking business operated out of at least four other states: Montana, Illinois, California, and Wisconsin.

confirmed the smell of narcotics coming from the vehicle, troopers found over one pound of methamphetamine under the center console.

Troopers arrested Heard on state charges (later dismissed) of possession of methamphetamine. The Michigan State Police then obtained a warrant to search Heard's and Blackman's respective cell phones. Heard's phone contained hundreds of records of contacts with known methamphetamine dealers and purchasers. While Heard was in state custody, a federal grand jury indicted both him and Blackman for possession with intent to distribute methamphetamine and for aiding and abetting such possession. Heard remained in state custody until August 30, 2023, when he appeared before a U.S. Magistrate Judge and went into federal custody.

Blackman's initial cooperation with law enforcement came at a cost. On October 2, 2023, Heard called his friend Devine Wilson and asked Wilson to post a picture of Blackman on social media, along with Blackman's identifying information. Heard told Wilson he "wanted that sh*t to go on the book, on all social media" and wanted "mother f*ckers to see the face of dude" (referring to Blackman). R. 77, PSR ¶ 42, PageID 236. Heard explained that he needed Blackman's picture attached to the post because the "mother f*ckers" otherwise "won't know who you're talking about" because Blackman "change [sic] his name and everything." *Id.* Heard reiterated to Wilson, "I wanted you to make sure mother f*ckers on the street get that sh*t. So mother f*ckers will know, on stone." *Id.* That same day, Heard called his daughter three times to confirm the post was on social media according to his directions. She confirmed the post was up. The post read, "Davell Blackman [rat emoji] [thumbs-down emoji] SHARE !!!!" *Id.* ¶ 44. Attached to the post were three photographs of Blackman and a police report summarizing Blackman's statements to law enforcement. A comment on the post included Blackman's recent

2

booking photo, a description of Blackman, and his current charges. Investigators later located the post, which was then removed.

On October 19, 2023, Blackman participated in a proffer interview with law enforcement. He said that he had known Heard for 30 years, and that Heard had sold drugs since 2006 and methamphetamine since 2021. Blackman admitted to taking drug-dealing trips with Heard to Los Angeles, Chicago, Montana, and Northern Michigan. Blackman stated Heard would buy methamphetamine by the pound and either ship it through USPS or deliver it to the buyer in person. On January 18, 2024, Blackman participated in another proffer interview, this time with federal investigators, where he confirmed the details of the drug trafficking trip that resulted in Heard's arrest.

Heard pleaded guilty on January 25, 2024. Two months later, Blackman was assaulted twice while in state prison. Blackman told law enforcement that the assailants were Heard's friends and that the assailants called him a "rat" who "told" on Heard. R. 88, Gov't Sent. Mem., PageID 377. Video footage showed the same assailant attacking Blackman in both incidents. After the second attack, Blackman was hospitalized with a dislocated back, two fractured ribs, and blood trauma to his head.

Heard's initial Presentence Investigation Report (PSR) recommended three enhancements: (1) a two-level enhancement for possession of a firearm; (2) a two-level enhancement for maintaining drug premises, based on his drug trafficking in Montana; and (3) a two-level enhancement for obstruction of justice, based on his post-arrest treatment of Blackman. Heard objected to using his Montana drug trafficking as relevant conduct, and to the application of the first two enhancements. The final PSR reduced the drug quantity calculation but kept the three

3

enhancements. Heard maintained his prior objections and also objected to the obstruction-of-justice enhancement.

At sentencing, the district court applied a three-level reduction for acceptance of responsibility, over the government's objection. The court also found that the Montana conduct was relevant conduct for the purposes of applying the firearm-possession and drug-premises enhancements. It then applied the enhancements for possessing a firearm. The court calculated the total converted methamphetamine weight attributable to Heard at 35,000 kilograms. In making this calculation, the court relied on 8,062 kilograms seized in the traffic stop; 9,072 kilograms testified to by M.N., a known buyer; and 18,144 kilograms from Blackman's testimony. The court noted that the latter two amounts were conservative estimates: M.N. had testified that she bought a few ounces more than that from Heard, and the court credited Blackman's testimony only as to the one trip he joined with Heard because Blackman incriminated himself in that testimony.

The drug calculation brought Heard to an offense level of 36. Adding the firearm possession, premises, and obstruction enhancements raised Heard's offense level to 42. After subtracting three points for acceptance of responsibility, Heard's offense level was 39. With his undisputed criminal history category of V, the Guidelines range was 360 months to life, but the charges carried a statutory maximum sentence of 240 months. The court explained that, if it removed the relevant-conduct enhancements for firearm possession and drug premises, the Guidelines range would have been 168 to 210 months. Heard asked for a 120-month sentence, but the court responded that would be insufficient to deter Heard and protect the public, and it was unrealistic given his extensive history of drug trafficking. Ultimately, the court varied downward, giving Heard a sentence of 180 months.

The court reasoned that "the overall goal [in sentencing] is to have a lengthy enough sentence [for] appropriate punishment but still leave room and opportunity for somebody to come back into the community on a positive basis." R. 118, Sent. Tr., at PageID 575. So, in the district judge's words, the appropriate sentence was:

> 180 months, which is still a long time. It's longer certainly than Mr. Heard has had so far in his time, but appropriately so. It's an incremental punishment because things haven't cleared up in the direction we want them to go, and in some ways have become worse, and there needs to be appropriate punishment for that, but in my mind, all things considered, 180 months accomplishes that in a way that is sufficient but not greater than necessary.

*Id.* at PageID 576–77.

## II.

Heard argues that his sentence was procedurally unreasonable. To render a procedurally reasonable sentence, a district court must "properly calculate the guidelines range, treat that range as advisory, consider the sentencing factors in 18 U.S.C. § 3553(a), refrain from considering impermissible factors, select the sentence based on facts that are not clearly erroneous, and adequately explain why it chose the sentence." *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)).

As the bases for his procedural unreasonableness challenge, Heard claims the district court committed five errors. According to Heard, the court (1) relied on insufficient and unreliable evidence when it ruled that his alleged drug trafficking in Montana was relevant conduct for purposes of applying Guidelines enhancements, (2) clearly erred when it applied an enhancement for possession of a firearm, (3) clearly erred when it applied an enhancement for maintaining a drug premises, (4) clearly erred in determining the quantity of drugs attributable to him, and (5) erroneously applied the obstruction-of-justice enhancement to his sentence.

We first address issues (4)–(5) and explain why the district court committed no procedural error in determining the total weight of methamphetamine attributable to Heard or in applying the obstruction-of-justice enhancement. Then we explain why any error on issues (1)–(3) was harmless.

## A. Drug Weight Attributable to Heard

"We review for clear error the district court's factual findings on drug quantity attributable to a defendant for sentencing purposes." *United States v. Rios*, 830 F.3d 403, 436 (6th Cir. 2016). That includes the district court's determinations about reliability of evidence and credibility of witnesses. *United States v. Armstrong*, 920 F.3d 395, 398 (6th Cir. 2019); *United States v. Owusu*, 199 F.3d 329, 339 (6th Cir. 2000), *abrogated on other grounds by Buford v. United States*, 532 U.S. 59 (2001). "When the precise quantity of drugs involved is uncertain, the district court must err on the side of caution and may only hold a defendant accountable for a specific quantity for which he is more likely than not actually responsible." *Rios*, 830 F.3d at 436 (cleaned up).

The district court did not clearly err in calculating the total drug weight attributable to Heard because it erred on the side of caution and properly used its discretion to weigh the reliability of evidence. The court relied on three pieces of evidence to arrive at a drug weight of approximately 35,000 kilograms: the amount seized in the traffic stop, M.N.'s testimony, and Blackman's testimony. Heard does not dispute the amount seized in the traffic stop, which totaled 8,062 kilograms in converted drug weight. Rather, he claims that M.N. and Blackman were "unreliable informants," *see* Appellant Br. at 12, so the district court erred in relying on their statements to calculate the total drug quantity. But the district court took possible unreliability issues into account and made only conservative quantity estimates from M.N. and Blackman's testimony. M.N. reported that she bought about half a pound of methamphetamine from Heard

once, and one to two ounces on many different occasions. The district court attributed only approximately a pound—9,072 kilograms converted weight—to her testimony, less than she reported and less than was overwhelmingly likely. Similarly, Blackman testified that Heard made multiple drug trafficking trips to California. But the court credited the amount of methamphetamine trafficked on only one of those trips (two pounds or 18,144 kilograms in converted weight) because Blackman incriminated himself by testifying that he joined Heard on that trip.

The court had access to the entire record and was entitled to make its own reliability determinations based on that record. *See Owusu*, 199 F.3d at 339 ("We defer to a district court's credibility determinations unless they have no foundation."). The court credited some of M.N.'s and Blackman's statements and discredited others. Heard has not shown that the court clearly erred in making these discretionary determinations—especially because the court made conservative estimates. We therefore affirm the district court's drug calculation determination. *See Rios*, 830 F.3d at 436-37 (affirming over defendant's objections the district court's drug quantity calculation based on the court's weighing of record evidence); *United States v. Williams*, No. 22-1522, 2023 WL 5206439, at *3 (6th Cir. Aug. 14, 2023) (same), *cert. denied*, 144 S. Ct. 520 (2023).

## B. Obstruction-Of-Justice Enhancement

The standard of review is not certain for Heard's challenge to the obstruction-of-justice enhancement. "While we certainly review legal conclusions de novo and factual findings for clear error, we have not settled on what deference we give the district court's application of [the enhancement] to the facts." *United States v. Histed*, 93 F.4th 948, 960 (6th Cir. 2024). We have reviewed the district court's application of facts to enhancements sometimes for clear error and

sometimes de novo. *Compare United States v. Jackson-Randolph*, 282 F.3d 369, 390 (6th Cir. 2002) (applying clear error review), *with United States v. Kamper*, 748 F.3d 728, 744 (6th Cir. 2014) (applying de novo review). But "we do not resolve this question here because [Heard's] challenge fails even under *de novo* review." *United States v. French*, 976 F.3d 744, 749 (6th Cir. 2020).

The Guidelines require a two-level enhancement when "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense . . . ." U.S.S.G. § 3C1.1. "'[T]hreatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so' is 'covered conduct' under the enhancement." *United States v. Sykes*, 65 F.4th 867, 889 (6th Cir. 2023) (quoting U.S.S.G. § 3C1.1 cmt. n.4(A)), *cert. denied*, 144 S. Ct. 576 (2024). The § 3C1.1 enhancement applies if a defendant's behavior "can be reasonably construed as a threat." *Kamper,* 748 F.3d at 744. Additionally, the § 3C1.1 enhancement "covers indirect threats delivered through an intermediary, such as Facebook, regardless of whether an intended recipient learns of the threat or actually feels intimidated by the threat." *French*, 976 F.3d at 749.

Heard's behavior was threatening and intimidating. We do not have to guess Heard's motive for posting Blackman's photo on Facebook with rat and thumbs-down emojis. Heard plainly articulated his reason: to inform "mother f*ckers on the street" that Blackman was a snitch. As the district court put it, "lashing out to post . . . on social media that your Codefendant . . . is a rat, and wanting people on the street to know it, is a clear message. It is the law of the street and the law of the street is take care of this. Let's shut this guy up. And that's the whole point of

putting that kind of information out there on social media." R. 118, Sent. Tr., PageID 542. We agree.

In *Kamper* and *French*, we affirmed the district court's application of the obstruction-of-justice enhancement where the defendant called a cooperating witness a "snitch" and a "rat." *See generally Kamper*, 748 F.3d 728; *French*, 976 F.3d 744. In *Kamper*, we found a defendant's behavior threatening when he told other inmates in prison that a witness cooperating with the government was a "rat and a snitch." 748 F.3d at 734, 744. Even though the defendant did not threaten the witness to his face, the defendant's statement was threatening because the witness was housed in the same prison. *Id.* at 744–45. And it was common knowledge that "snitches are not well-received in jails and in prisons." *Id.* at 745 (cleaned up). So we "reasonably construed" the defendant's statement "as an indirect threat," justifying application of the obstruction-of-justice enhancement. *Id.*

Similarly, in *French*, the district court applied the enhancement because French, the defendant, made a threatening Facebook post about a witness, Blackmon. 976 F.3d at 746. Blackmon was French's co-defendant who had pleaded guilty and testified against French at French's trial. *Id.* at 745-46. Shortly before his sentencing hearing, French posted about Blackmon on Facebook. *Id.* at 746. The posts, visible to all of French's Facebook friends, "accused Blackmon of being a 'rat' and 'snitching for time cuts,' and included discovery documents showing Blackmon's cooperation with authorities." *Id.* at 749. We concluded the posts "conveyed animus for anyone cooperating with law enforcement against French." *Id.* And because French made the statements about Blackmon on Facebook, they were "public" and threatening to anyone "who had been cooperating with the government"—including victims. *Id.* at 750. We therefore

held it was reasonable to conclude that "French's Facebook posts acted as a threat to those who might assist law enforcement to [his] detriment." *Id.*

*Kamper* and *French* are on point here. Blackman cooperated with the government and gave incriminating information against Heard. Heard responded by effectively placing a target on Blackman's back. Even if Heard's threat was indirect—because it was made on social media, not directly to Blackman—it sent a clear message to Heard's compatriots: target Blackman. Also, by posting on social media, Heard sent a broader threatening message to anyone who might dare testify against him: do what Blackman did and you'll end up with a target on your back like Blackman now has. As in *French*, Heard's post here threatened not just Blackman, but anyone who might serve as a witness against Heard.

Heard claims he did not intend to threaten or intimidate anyone but merely lashed out in retaliation. He relies on *United States v. Turner*, where we held that the obstruction enhancement did not apply to a defendant's purely retaliatory conduct. 738 F. App'x 856, 863-64 (6th Cir. 2018). In that case, Turner, the defendant, asked a fellow inmate to murder an informant but to wait until after Turner was sentenced and imprisoned. *Id.* at 859. We held the obstruction enhancement did not apply because Turner "sought only retaliation." *Id.* at 862. *Turner*'s holding, however, depended on two key facts that differ here. First, no one disputed that Turner's conduct was purely retaliatory. *Id.* Second, "Turner was not attempting to influence the informant." *Id.* Turner's murderous plot would not affect his criminal proceedings because he wanted the informant murdered *after* the criminal proceedings ended. *Id.* So, we reasoned, he did not "obstruct justice 'with respect to the investigation, prosecution, or sentencing of [his] offense of conviction,' as required by the guideline." *Id.* (quoting U.S.S.G. § 3C1.1).

*Turner* does not apply here. First, the government does not agree that Heard's conduct was purely retaliatory. Second, and key here, Heard's timing differs from Turner's timing. Turner wanted the informant to suffer consequences *after* Turner's proceedings ended—that is why we deemed his conduct, though egregious, purely retaliatory. But Heard wanted Blackman to suffer consequences in the midst of Heard's proceedings. Heard threatened Blackman at a time when Blackman might possibly—and actually did—continue to testify against Heard. Heard made the Facebook post just after his indictment, before he pleaded guilty, before Blackman proffered to federal investigators, and before Heard was sentenced. Thus, Heard "willfully . . . attempted to obstruct or impede, the administration of justice with respect to [his] investigation, prosecution, [and] sentencing," U.S.S.G. § 3C1.1, by "threatening, intimidating, [and] otherwise unlawfully influencing a co-defendant [and] witness," *id.* cmt. n.4(A). *See United States v. Dodson*, No. 22-3998, 2024 WL 712494, at \*10 (6th Cir. Feb. 21, 2024) (threat constituted obstruction of justice when made after guilty plea but before sentencing). We therefore affirm the district court's application of the obstruction-of-justice enhancement.

## C. Harmless Error

Given our affirmance of the district court on the drug quantity attributable to Heard and the obstruction-of-justice enhancement, we need not address the other three issues Heard presents. That is because we apply harmless error when considering whether to remand for resentencing. *United States v. O'Georgia*, 569 F.3d 281, 288 (6th Cir. 2009); *see also United States v. Faulkner*, 926 F.3d 266, 275 (6th Cir. 2019) ("Errors that do not affect the ultimate Guidelines range or sentence imposed are harmless and do not require resentencing."). An error is harmless "when the record shows that 'the district court thought the sentence it chose was appropriate irrespective of the Guidelines range,' or when the court provides an explanation that makes clear that it selected

the sentence based 'on factors independent of the Guidelines.'" *United States v. Tobias*, 101 F.4th 473, 482 (6th Cir. 2024) (quoting *Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016)). Further, "the erroneous application of a departure provision is harmless where the district court independently supports its choice of a sentence by a proper use of the § 3553(a) factors." *O'Georgia*, 569 F.3d at 288. "The government [bears] the burden to prove with certainty that the error was harmless." *Tobias*, 101 F.4th at 482 (cleaned up).

The government has met its burden. The district court provided an independent basis for the sentence and properly applied § 3553(a) factors to justify its departure. Additionally, we can say "with certainty" that the same Guidelines range would apply despite any errors on issues (1)–(3). Even if we reversed the district court on Heard's contentions of error (1)–(3), it would result in the same Guidelines sentence of 240 months if the 35,000 kilogram drug calculation and the obstruction-of-justice enhancement still applied. Thus, any alleged error on issues (1)–(3) was harmless.

The district court explained why the chosen sentence was appropriate independent of what Heard claims would have been the correct Guidelines range. The district court noted that Heard had a "significant criminal history" and his prior time in prison had no deterrent effect. R. 118, Sent. Tr., PageID 574–75. The district court mentioned the need to balance punishment and rehabilitation in choosing the sentence length. While the statutory maximum of 240 months was "too much," the district court thought Heard's suggestion of 120 months was insufficient to "protect the public." *Id.* at PageID 576. So the district court settled on 180 months, a significant downward variance, explaining that it struck the right balance between the sentencing factors. Thus, the district court independently supported the sentence, *Tobias*, 101 F.4th at 482, and explained why the § 3553(a) factors justified the departure, *O'Georgia*, 569 F.3d at 288.

Finally, even if Heard were right on contentions (1)–(3), the original sentence would still be the same under the Guidelines. In calculating Heard's sentence, the district court applied two enhancements based on relevant conduct, an obstruction-of-justice enhancement, a converted drug quantity of 35,000 kilograms, and a three-point reduction for acceptance of responsibility. This resulted in a Guidelines range of 360 months to life, but the statutory maximum was 240 months. "Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence." U.S.S.G. § 5G1.1(a). Thus, the court's calculation resulted in a 240-month Guidelines sentence (from which the court varied downwards to 180 months).

Harmless error applies because, even if the district court erred on issues (1)–(3), Heard's Guidelines sentence would still be 240 months. Discounting Heard's alleged Montana conduct, the district court's drug calculation and the obstruction-of-justice enhancement result in a base offense level of 38. Subtracting three points for acceptance of responsibility makes Heard's final offense level 35. An offense level of 35 plus criminal history category V equal a Guidelines range of 262–327 months. U.S.S.G. Ch 5., Pt. A. This range carries the exact same statutory maximum as the district court's calculated range—240 months. Thus, even if the district court erred in considering Heard's Montana conduct and applying the firearms and premises enhancements, Heard's Guidelines sentence would be exactly the same on remand. Any such error was therefore harmless. *See United States v. Grams*, 566 F.3d 683, 687 (6th Cir. 2009).

### III.

The district court did not err in calculating the converted drug weight attributable to Heard or in applying the obstruction-of-justice enhancement. Because we affirm the district court on these two issues, any other alleged errors were harmless. The district court independently justified

Heard's sentence, and his Guidelines sentence would be the same on remand.  Therefore, we reject

Heard's arguments and **AFFIRM**.